ORIGINAL

1   COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
2   CHRISTOPHER P. SEEFER (201197)
      DANIEL J. PFEFFERBAUM (248631)
3   100 Pine Street, Suite 2600
      San Francisco, CA 94111
4   Telephone: 415/288-4545
      415/288-4534 (fax)
5   chriss@csgrr.com
      dpfefferbaum@csgrr.com
6      – and –
      DARREN J. ROBBINS (168593)
7   MATTHEW P. MONTGOMERY (180196)
      655 West Broadway, Suite 1900
8   San Diego, CA 92101-3301
      Telephone: 619/231-1058
9   619/231-7423 (fax)
      darrenr@csgrr.com
10   mattm@csgrr.com

11   Attorneys for Plaintiff

12                     UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14   INTER-LOCAL PENSION FUND GCC/IBT,  )   No.  09           0546
      on Behalf of Itself and All Others Similarly  )
15   Situated,                                      )   CLASS ACTION
                                                    )
16                            Plaintiff,            )   COMPLAINT FOR VIOLATIONS OF THE
                                                    )   FEDERAL SECURITIES LAWS
17                 vs.                              )
                                                    )
18   RIGEL PHARMACEUTICALS, INC., JAMES )
      M. GOWER, RYAN D. MAYNARD,          )
19   DONALD G. PAYAN, RAUL R.             )
      RODRIGUEZ, ELLIOTT B. GROSSBARD,   )
20   JEAN DELEAGE, BRADFORD S.            )
      GOODWIN, GARY A. LYONS, WALTER H. )
21   MOOS, HOLLINGS C. RENTON, PETER S.  )
      RINGROSE, STEPHEN A. SHERWIN,       )
22   CREDIT SUISS SECURITIES (USA) LLC,   )
      OPPENHEIMER & CO. INC., THOMAS      )
23   WEISEL PARTNERS LLC and JEFFERIES & )
      COMPANY, INC.,                      )
24                                        )
                            Defendants.   )
25   _____)   DEMAND FOR JURY TRIAL

26

27

28

**NATURE OF THE ACTION**

1.     This is a securities class action on behalf of all persons who acquired the securities of Rigel Pharmaceuticals, Inc. ("Rigel" or the "Company") between December 13, 2007 and October 27, 2008 (the "Class Period"), including all persons who acquired the common stock of Rigel pursuant and/or traceable to a false and misleading registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's February 2008 secondary offering (the "Offering"). This action asserts strict liability claims under the Securities Act of 1933 ("1933 Act") and fraud claims under the Securities Exchange Act of 1934 (the "1934 Act") against Rigel, its senior insiders and the investment banks which underwrote the Offering (collectively, "defendants").

2.     Rigel is a clinical-stage drug development company that discovers and develops novel, small-molecule drugs for the treatment of inflammatory/autoimmune diseases and cancer, as well as viral and metabolic diseases. The Company was founded in 1996 and is based in South San Francisco, California.

3.     Rigel was developing a new drug, R788, for the treatment of rheumatoid arthritis. On December 13, 2007, Rigel issued a press release and held a conference call touting the positive summary results of a then-recently-completed clinical trial of R788 in 189 patients in the U.S. and Mexico (the "Study"). The press release was an exhibit to a Form 8-K filed with the United States Securities and Exchange Commission ("SEC") the same day. In response to the announcement of the summary results of the Study, Rigel's common stock price more than tripled in one day, from \$8 per share to \$25.95.

4.     On January 24, 2008, Rigel filed an S-3ASR Registration Statement for an offering of common stock. The Registration Statement incorporated by reference the December 13, 2007 Form 8-K. On February 6, 2008, Rigel consummated the Offering, selling five million shares of common stock at a price of \$27 per share for proceeds of \$135 million.

5.     On February 11, 2008, defendant James M. Gower again touted the positive results of the Phase II clinical trial of R788 during the BIO CEO Investor conference. On July 8, 2008,

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                      - 1 -

1  defendant Raul R. Rodriguez also touted the positive results of the Phase II clinical trial of R788
2  during the Collins Stewart 4th Annual Growth Conference.

3      6.      On October 27, 2008, Rigel presented the full results of the Study at a meeting of the
4  American College of Rheumatology and on an investor conference call. Those results contained
5  adverse information omitted from the Company's December 13, 2007 press release and Form 8-K,
6  as well as from the Registration Statement and the presentations on February 11, 2008 and July 8,
7  2008. When this adverse information about the Study's results was finally disclosed, Rigel's stock
8  price plunged 38% in a single day, from $14.41 to $8.84.

9      7.      The true facts which defendants failed to disclose were: (a) patients in Mexico had
10  higher response rates in both the placebo and treated arms than the U.S. patients, which may have
11  contributed disproportionately to the overall reported benefit observed at the higher doses, as nearly
12  all patients in the 150mg cohort and no patients in the 50mg cohort were from Mexico; (b) R788
13  caused an increase in average blood pressure which was important because it could signal an
14  increase in cardiovascular risk, the mechanism that caused the increase was not well understood and
15  the increase in blood pressure could be a stumbling block for some pharmaceutical companies that
16  were considering licensing the drug; and (c) patients in the Study taking R788 experienced increased
17  liver enzymes compared to patients taking the placebo.

18                          **JURISDICTION AND VENUE**

19      8.      The claims alleged herein arise under §§10(b) and 20(a) of the 1934 Act (15 U.S.C.
20  §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5),
21  and §§11, 12(a)(2) and 15 of the 1933 Act (15 U.S.C. §§77k, 77l(a)(2) and 77o).

22      9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.
23  §1331, §22 of the 1933 Act and §27 of the 1934 Act.

24      10.     Venue is proper pursuant to §22 of the 1933 Act and §27 of the 1934 Act. The
25  Company is located in this District, and the false and misleading statements were made in this
26  District.

27

28

1

**PARTIES**

2    11.    Plaintiff Inter-Local Pension Fund GCC/IBT acquired the common stock of Rigel

3    pursuant or traceable to the Offering and has been damaged thereby.

4    12.    Defendant Rigel is headquartered in South San Francisco, California. Its stock trades

5    in an efficient market on the NASDAQ.

6    13.    Defendant James M. Gower ("Gower") was, at all relevant times, Chairman of the

7    Board and Chief Executive Office ("CEO") of the Company.  Gower signed or authorized the

8    signing of the false and misleading Registration Statement.

9    14.    Defendant Ryan D. Maynard ("Maynard") was, at all relevant times, Chief Financial

10   Officer ("CFO") of the Company.  Maynard signed or authorized the signing of the false and

11   misleading Registration Statement.

12   15.    Defendant Donald G. Payan ("Payan") was, at all relevant times, Executive Vice

13   President of Discovery and Research of the Company. Payan signed or authorized the signing of the

14   false and misleading Registration Statement.

15   16.    Defendant Raul R. Rodriguez ("Rodriguez") was, at all relevant times, Executive

16   Vice President and Chief Operating Officer ("COO") of the Company.

17   17.    Defendant Elliott B. Grossbard ("Grossbard") was, at all relevant times, Executive

18   Vice President and Chief Medical Officer of the Company.

19   18.    Defendant Jean Deleage ("Deleage") was, at all relevant times, a director of the

20   Company.  Deleage signed or authorized the signing of the false and misleading Registration

21   Statement.

22   19.    Defendant Bradford S. Goodwin ("Goodwin") was, at all relevant times, a director of

23   the Company.  Goodwin signed or authorized the signing of the false and misleading Registration

24   Statement.

25   20.    Defendant Gary A. Lyons ("Lyons") was, at all relevant times, a director of the

26   Company.  Lyons signed or authorized the signing of the false and misleading Registration

27   Statement.

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    - 3 -

21.    Defendant Walter H. Moos ("Moos") was, at all relevant times, a director of the Company.    Moos signed or authorized the signing of the false and misleading Registration Statement.

22.    Defendant Hollings C. Renton ("Renton") was, at all relevant times, a director of the Company.    Renton signed or authorized the signing of the false and misleading Registration Statement.

23.    Defendant Peter S. Ringrose ("Ringrose") was, at all relevant times, a director of the Company.    Ringrose signed or authorized the signing of the false and misleading Registration Statement.

24.    Defendant Stephen A. Sherwin ("Sherwin") was, at all relevant times, a director of the Company.    Sherwin signed or authorized the signing of the false and misleading Registration Statement.

25.    The defendants referenced above in ¶¶13-24 are referred to herein as the "Individual Defendants."

26.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") operates as an investment bank in the United States. Its businesses include securities underwriting, sales and trading, investment banking, private equity, alternative assets, financial advisory services, investment research, and asset management.  Credit Suisse acted as an underwriter in connection with the Offering.

27.    Defendant Oppenheimer & Co. Inc. ("Oppenheimer") is an investment bank and full-service investment firm.  Oppenheimer acted as an underwriter in connection with the Offering.

28.    Defendant Thomas Weisel Partners LLC ("Thomas Weisel") is an investment bank founded in 1998 focused primarily on the growth sectors of the economy.  Thomas Weisel acted as an underwriter in connection with the Offering.

29.    Defendant Jefferies & Company, Inc. ("Jefferies") is a full-service global investment bank and institutional securities firm focused on growing and middle-market companies and their investors.    Jefferies provides clients with capital markets and financial advisory services,

1 │ institutional brokerage, securities research and asset management. Jefferies acted as an underwriter

2 │ in connection with the Offering.

3 │     30.    Pursuant to the 1933 Act, the defendants referenced in ¶¶26-29 above are referred to

4 │ herein as the "Underwriter Defendants."

5 │     31.    The Underwriter Defendants are ***strictly liable*** for the false and misleading statements

6 │ in the Registration Statement. In connection with the Offering, the Underwriter Defendants drafted

7 │ and disseminated the Registration Statement and were paid over *$7 **million*** in gross fees in

8 │ connection therewith. The Underwriter Defendants' failure to conduct an adequate due diligence

9 │ investigation was a substantial factor leading to the harm complained of herein.

10 │ 
### FALSE AND MISLEADING STATEMENTS
### DURING THE CLASS PERIOD

11 │

12 │     32.    On December 13, 2007, the Company issued a press release entitled "Rigel's R788

13 │ Demonstrates Significant Improvement in Rheumatoid Arthritis in Phase 2 Clinical Study; Achieves

14 │ Statistically Significant ACR20, ACR50 & ACR70 Results." The release stated in part

15 │     Rigel Pharmaceuticals, Inc. today announced that its oral syk kinase inhibitor, R788 (*tamatinib fosdium*), has demonstrated statistically significant results in treating Rheumatoid Arthritis (RA) patients in a recently completed Phase 2 clinical trial.

16 │ Groups treated with R788 at 100mg and 150mg po bid (orally, twice daily), showed higher ACR20, ACR50, ACR70 and DAS28 response rates than the placebo group.

17 │ The efficacy results for the 100mg and the 150mg dose groups were fairly comparable. Dramatically, the onset of the effect in these dose groups occurred as

18 │ early as one week after initiation of therapy. We believe that the significant ACR scores and good tolerability observed in this clinical trial, and the further benefit of

19 │ oral delivery may make R788 a favorable alternative to the currently marketed biological agents.

20 │

       \*      \*      \*

21 │

22 │     "This clinical study has shown that R788 treatment can achieve impressive ACR response rates," said Elliott Grossbard, M.D., senior vice president of medical development at Rigel. "In this clinical trial both the 100mg and 150mg doses

23 │ improved arthritis symptoms and did so quickly. We plan to initiate the next clinical trial with R788 in RA in 2008," he added.

24 │

       \*      \*      \*

25 │

26 │     James M. Gower, chairman and chief executive officer of Rigel said, "These very important clinical trial results are a major milestone for Rigel as we establish the potential of R788 in RA and its value as an alternative to current therapies. In

27 │ addition, given these results and the recent results in ITP, we believe that R788 may be a useful drug in the treatment of autoimmune diseases."

28 │

1    33.    The press release was included as an exhibit to a Form 8-K Rigel filed with the SEC

2 on December 13, 2007.

3    34.    On December 13, 2007, the Company also held a conference call attended by

4 defendants Gower, Grossbard, Payan, Maynard and Rodriguez. During the call, defendants Gower

5 and Grossbard repeated the positive results of the phase II clinical trial:

6           [Gower:] We were very pleased to be able to announce highly statistically
        significant results of a Phase 2 trial of 788 in patients with rheumatoid arthritis. And
7       I would like to introduce Dr. Elliot Grossbard to take us through the study results.
        Elliot?

8
                                *        *        *
9
           [Grossbard:] The efficacy results are shown in the graph on the handout that
10      many of you may have downloaded. As you can see, the highly significant effect for
        both the ACR 20, 50, 70 and DAS28 score. The p values are uniformly less than
11      .008, usually less than .001. Of note, although not included in this graph, is that the
        onset of the effect was within one week, and you could see significant differences
12      between the patients at one week after the initiation of treatment.

13          We have concluded that the 100 milligram and 150 milligram dose groups
        have impressive and statistically significant improvements over placebo, and that the
14      onset occurs very, very early. The efficacy results for the two effective doses were
        fairly comparable, and the 100 milligrams bid dose kind of caught up by the end so
15      that they were really equivalent. The 50 milligram dose [does] not appear to be
        much better than placebo, and so overall there was a good dose response.
16
            With regard to safety, which is going to be a close focus of the future
17      program, because I think this study fairly establishes with certainty that this drug is
        effective in rheumatoid arthritis.
18
            We had a number of dose reductions in the study, either due to ALP
19      elevations, or much more commonly, neutrophil counts below 1500. Typically I
        would ask the sites to hold the drug until the ALP came back towards normal, or the
20      neutrophil count went above 1500, and then they would restart at half the dose.

21          Of the patients who had their doses reduced, and overall there were about 20
        or close to 20 in the study, 18 of those 20 finished the study at the reduced dose.
22      And the ACR20 response rate in that group was greater than 80%, and the ACR50
        response rate was greater than 50%. So it would appear that at least in patients who
23      are responding you can reduce the dose significantly, ameliorate some of the
        concerns and still maintain a very significant clinical effect.
24
            In terms of dropouts, there were more dropouts in the placebo group than in
25      any R788 group. Most of those in the placebo were under the category withdrew
        consent, which often, if not always, means the patients were unsatisfied with the way
26      their treatment was going. At the 150 milligram dose we had a number of dropouts
        for adverse events.
27

28

1

The incidence of neutropenia, as I mentioned, was modest. In the 100 milligram dose I think there were five patients out of the 49, but it was a much higher percentage of the dose 150 milligrams twice a day.

2

3

In terms of ALP elevations greater than three times the upper limit of normal, which is the marker that FDA recently recommended in their guidelines for development of new (technical difficulty) there were two patients in the placebo group who had ALP elevations, and three in the high dose group, and none in the two intermediate groups. The most prevalent side effect beyond neutropenia in the high dose group was a combination of gastrointestinal side effects, diarrhea and nausea, dyspepsia and so on.

4

5

6

7

The incidence of reported moderate hypertension was quite low, although the way case report forms are filled out an occasional patients [sic] had a notation for his systolic blood pressure increase, and an occasional one had diastolic blood pressure increase. And it is hard to know exactly what that means, so I'm reporting to you here those where the case report forms noted, hypertension of moderate severity. So in conclusion we think the 100 milligram dose was well tolerated. The 150 milligram dose somewhat less so. But with dose reductions almost all the patients were able to finish the study.

8

9

10

11

The most common side effects were neutropenia and gastrointestinal side effects and they are most prevalent in the 150 milligram bid dose.

12

13

I think – my personal opinion is that this study establishes with very little uncertainty that this drug at 100 milligrams a day – 100 milligrams twice a day or more is highly effective in the treatment of rheumatoid arthritis in terms of clinical signs and symptoms. We have not investigated the question of bone erosions and joint damage – we will in a future study.

14

15

16

The benefits are seen quickly, as early as one week after treatment. And the fact that we're talking here about pills and not injections make this a very interesting compound going forward into our next set of studies.

17

18      35.     The positive results of the Phase II clinical study reported in the December 13, 2007

19  press release and conference call were repeated to the market in reports issued by analysts following

20  the Company, including reports issued on December 13, 2007 by CIBC World Markets analyst Brian

21  Abrahams, Jeffries & Company, Inc., analyst Adam A. Walsh, and Credit Suisse analyst Michael

22  Aberman. Abrahams reported that CIBC World Markets expected upside in Rigel's stock price

23  because the results of the Phase II clinical study provided "strong proof-of-concept for systemic Syk

24  kinase inhibition in rheumatoid arthritis, and unlocks the potential for the agent to be used in other

25  chronic autoimmune conditions as well."

26      36.     Credit Suisse analyst Aberman increased the price target of Rigel stock from $12 to

27  $25 and wrote "It is hard to imagine better results than Rigel achieved with R788 in RA and we

28  think this compound has a good chance of becoming a blockbuster for autoimmune diseases."

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                          - 7 -

1  Jeffries & Company analyst Walsh increased the price target for Rigel stock from $16 per share to
2  $19 per share.

3  37.  The analysts were correct. Rigel's stock price more than tripled, from $8 per share on
4  December 12, 2007 to $25.95 on December 13, 2007, the day defendants announced the results of
5  the Study.

6  38.  The true facts that Rigel and the Individual Defendants failed to disclose were: (a)
7  patients in Mexico had higher response rates in both the placebo and treated arms than the U.S.
8  patients, which may have contributed disproportionately to the overall reported benefit observed at
9  the higher doses, as nearly all patients in the 150mg cohort and no patients in the 50mg cohort were
10  from Mexico; (b) R788 caused an increase in average blood pressure, which was important because
11  it could signal an increase in cardiovascular risk, the mechanism that caused the increase was not
12  well understood and the increase in blood pressure could be a stumbling block for some
13  pharmaceutical companies that were considering licensing the drug; and (c) patients in the Study
14  taking R788 experienced increased liver enzymes compared to patients taking the placebo.

15  **THE FALSE AND DEFECTIVE REGISTRATION
STATEMENT AND PROSPECTUS**

16

17  39.  Plaintiff's claims for the false and misleading statements and omissions in the
Registration Statement and Prospectus for the February 2008 Offering are brought under the 1933
18  Act only and are grounded in strict liability and negligence. Plaintiff does not assert claims of
19  deliberate misconduct with respect to the false and misleading statements and omissions in the
20  Registration Statement and Prospectus for the February 2008 Offering.

21  40.  On or about January 24, 2008, Rigel filed with the SEC a Form S-3ASR Registration
22  Statement for the Offering.

23  41.  On February 1, 2008, Rigel filed with the SEC a Prospectus for the Offering.

24  42.  On February 6, 2008, at least 5 million shares of Rigel stock were sold to the public at
25  $27.00 per share, raising $135 million.

26  43.  The Registration Statement contained untrue statements of material fact or omitted to
27  state other facts necessary to make the statements made therein not misleading and was not prepared
28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                   - 8 -

1 in accordance with applicable SEC rules and regulations. Specifically, the Registration Statement

2 provided "the following documents filed with the SEC are incorporated by reference . . . : Our

3 current report on Form 8-K, filed with the SEC on December 13, 2007." The Form 8-K Rigel filed

4 with the SEC on December 13, 2007 reiterated the contents of the December 13, 2007 press release

5 quoted above.

6     44.    The true facts which were omitted from the Registration Statement were: (a) patients

7 in Mexico had higher response rates in both the placebo and treated arms than the U.S. patients,

8 which may have contributed disproportionately to the overall reported benefit observed at the higher

9 doses, as nearly all patients in the 150mg cohort and no patients in the 50mg cohort were from

10 Mexico; (b) R788 caused an increase in average blood pressure which was important because it

11 could signal an increase in cardiovascular risk, the mechanism that caused the increase was not well

12 understood and the increase in blood pressure could be a stumbling block for some pharmaceutical

13 companies that were considering licensing the drug; and (c) patients in the Study taking R788

14 experienced increased liver enzymes compare to patients taking the placebo.

15 ### FALSE AND MISLEADING STATEMENTS
### AFTER THE OFFERING

16

17     45.    On February 11, 2008, at the BIO CEO Investor Conference, defendant Gower made

the following statements:

18

19     The Phase II study that we announced in December was a study on 100 patients, double-blind, placebo-controlled in 30 centers in the US and Mexico. We saw rather unprecedented numbers in terms of the ACR scoring. As you can see on

20 the chart, significantly different as is noted by the stars in both the 100 milligram orally BID dose and 150 milligram orally BID dose across the board and all of

21 ACR20, ACR50, ACR70 and DAS scoring. Rather spectacular numbers for the higher two dose groups specifically in the ACR50's and '70s where we got between

22 50 and 60% ACR50 response and over one-third ACR70's at 90 days which is relatively unprecedented in these kind of studies if you want to look at previous

23 studies done in these same populations with the same protocol.

24     This was a very strict intense treat protocol. And done using the same protocols that have been used for pretty much everything from Enbrel on forward,

25 certainly the same protocols and the same, some of the same groups used in the studies done in the last few years with Rituxan and Orencia for approvals IL-6 and

26 the JAK3's in terms of study. So you can never compare studies directly one-to-one that aren't done in exactly the same time but these are using the same protocols and

27 the same approach so they should be roughly comparable.

28

1

2

3

4

     The safety results were also good. We did have two dose dependent toxicities that were noted. One was neutropenia, which we've known from the animal studies on forward that we carry a certain amount of neutropenia along with the mechanism of this growth comes most likely from its ability to regulate adhesion molecules and the monocytes. And there you are seeing a dose dependent matter that increased from about slightly under 10% to just under 20% of between the higher two dose groups.

5

6

7

8

9

10

11

12

     We had prespecified a protocol based dose reduction, which cut the dose in half for any patients that got a grade 2 neutropenia. This is a neutrophil count of 1500. We didn't see any grade 3 or grade 4 neutropenias in the study, and as many of you know those are the ones that are associated with infections. But because this was an early study we wanted to be extra cautious and we cut the dose in half. But when those patients hit a neutrophil count of 1500, all of those patients however did fine on the reduced dose. Actually we got, if you look at those as a group although we didn't – this is not prespecified as a statistical endpoint, their ACR20 at 90 days was 82% and those that continued on the study with the dose reductions. So they did quite well and maintained the efficacy and the neutropenia has not recurred nor has anyone dropped off the study because of neutropenia. But it is something which is not uncommon for this patient population. As many of you know, RA patients are predisposed to neutropenia. Methotrexate adds to it. Wheat appears added to that. That is something the rheumatologists have to watch but doesn't seem at this point to be something that is not manageable.

13

14

15

16

17

18

     The other thing that we saw that seems dose-related was lower GI disturbance, also something fairly common in this disease. Methotrexate alone as you would notice in the placebo group, those were all methotrexate plus a dummy 788, has a number of patients that have lower GI symptoms. We had a modest number in the intermediate dose group, slightly higher number in the upper dose group. As with the neutropenia no patients found this uncomfortable enough to want to drop off the study. None were hospitalized. None had to be rehydrated. But certainly it is a tolerance issue. Everything else that showed up is no different between the placebo group and the control group on the safety elements of the study. So, so far, so good.

19

20

21

22

23

24

25

26

27

    46.    The true facts that Gower failed to disclose were: (a) patients in Mexico had higher response rates in both the placebo and treated arms than the U.S. patients, which may have contributed disproportionately to the overall reported benefit observed at the higher doses, as nearly all patients in the 150mg cohort and no patients in the 50mg cohort were from Mexico; (b) R788 caused an increase in average blood pressure, which was important because it could signal an increase in cardiovascular risk, the mechanism that caused the increase was not well understood and the increase in blood pressure could be a stumbling block for some pharmaceutical companies that were considering licensing the drug; and (c) patients in the Study taking R788 experienced increased liver enzymes compared to patients taking the placebo.

28

47.   On July 8, 2008, at the Collins Stewart 4th Annual Growth Conference, defendant Rodriguez made the following statements:

Speaking of that, we last year started – reported a Phase II RA clinical trial. This is the data we reported in December of last year. This is a three-month study looking at R788 in patients with active RA all on a methotrexate background. It's a three-month study looking at those signs and symptoms.

What we saw, and you see in this graph, is that we had some dramatic improvement in the signs and symptoms looking at ACR20, ACR50, and ACR70 at the 100 milligram and the 150 milligram dose groups. This is all b.i.d. The 50 looked pretty much like placebo. The others looked quite dramatically.

In fact compared to other TNF agents or other products that are in the market now or in development now, this is in the higher range of those efficacy measures. So very dramatic improvement. We also saw a couple of things that we saw the benefit occur within the first two weeks of therapy. That is, even within the first week, we are able to see a dramatic improvement in signs and symptoms into the trial. That was sustained throughout the three months of the trial. So very nice results. Per the protocol, if we ran into any trouble with say neutropenia or elevated liver enzymes, the protocol required us to cut the dose in half. That is what occurred in a few cases.

You see some of the safety background on these various doses in this chart. We had some cases of neutropenia, five in the 100 milligram and 10 in the 150 milligram dose groups that required the dose to be reduced. A few liver enzymes elevated in 150 milligram. I should note that all the patients that had their dosage reduced, about 18 of them, completed the trial and their ACR20 scores, 82% of them met their ACR20 scores. So they had a very nice benefit even though their dose was reduced.

So effectively, if you had a benefit it occurred early in the trial and then if you needed your dose reduced it didn't seem to undermine the benefit that you did receive. So we were very satisfied with this. We had some GI side effects and they were somewhat random and transient, more in the 150 than the 100. A bit of hypertension here and there, but, basically, a fairly good safety profile.

The 100 milligram dose group had a very nice and profound efficacy result and a pretty good safety profile. So that is going to be the lead dose that we go forward. However, the drug does have a very good PKA; we have about a 17-hour half-life. So we are going to try to push that a little bit and see if once a day works.

48.   The true facts that Rodriguez failed to disclose were: (a) patients in Mexico had higher response rates in both the placebo and treated arms than the U.S. patients, which may have contributed disproportionately to the overall reported benefit observed at the higher doses, as nearly all patients in the 150mg cohort and no patients in the 50mg cohort were from Mexico; (b) R788 caused an increase in average blood pressure, which was important because it could signal an increase in cardiovascular risk, the mechanism that caused the increase was not well understood and

1   the increase in blood pressure could be a stumbling block for some pharmaceutical companies that

2   were considering licensing the drug; and (c) patients in the Study taking R788 experienced increased

3   liver enzymes compared to patients taking the placebo.

### THE TRUTH BEGINS TO COME TO LIGHT

5   49.     On October 27, 2008, the Company presented the full results of the Study at the

6   American College of Rheumatology ("ACR") meeting. The Company's presentation abstract on

7   R788 stated in part:

8       *Results*

9           Patient demographics and baseline clinical characteristics were similar
10      between groups. 158 of the 189 patients (84%) completed the study including 122
        patients (86%) in the R788 treatment groups and 36 patients (77%) in the placebo
11      group. The completion rate was similar among the R788 dose groups. The most
        common reasons for withdrawal were adverse events in the R788 100 mg and 150
12      mg groups and withdrawal of consent, usually related to lack of efficacy in the
        placebo and R788 50mg groups.

13          Doses of 100 and 150 mg po *bid* were significantly superior to placebo or 50
        mg po *bid* at week 12. Clinical effect was noted as early as week one. There was
14      also a significant decrease from baseline in the biomarkers serum IL-6 and MMP-3
        levels (p<0.002) in the 2 higher dose groups (100 mg and 150 mg) as compared to
15      placebo as early as week 1 and at week 12 as well. *The major adverse effects were*
        dose related and reversible and included diarrhea (45% with the 150 mg dose) and
16      *neutropenia (<1500/mm), which occurred overall in 15% of patients treated with*
        *R788*. Other adverse events included dizziness in 11% of patients in the 150mg
17      group and 2% of patients in the placebo group, and *HBP occurring in 5% of patients*
        *in the higher R788 dose groups and none in the placebo group.*

18
        *Conclusion*
19
            Inhibition of Syk signaling with a relatively selective inhibitor of Syk kinase
20      produced significant clinical benefits in a population of RA patients with active
        disease on MTX therapy. We are able to define a therapeutic dose based on the
21      efficacy and toxicity results. The 100 mg *bid* and the 150 mg *bid* doses were both
        effective with similar degrees of clinical response; however, there were more clinical
22      and laboratory adverse events with the 150 mg dose. The rapid onset of effect, the
        improvement in arthritis parameters and serum biomarkers show that inhibition of
23      Syk kinase is a viable new target for the treatment of rheumatoid arthritis. *Longer*
        *term studies are needed to further define the safety and efficacy profile of this*
24      *drug*.

25      50.     After defendants' presentation to the ACR on October 27, 2008, defendants held a

26  conference call for investors, as follows:

27          [Gower:]  The issue of the Mexico/US interaction before the study – I think we
        actually mentioned this at our original discussion on the Web after the study was
28      over.  I was concerned that there might be such an interaction.

1      And so, I requested before the study was unblinded that we do a country
2  interaction and it turned out there was one. And the issue of the interaction was that
   the *placebo rate was much higher in Mexico than in the US. And the response rate*
3  *was much higher in Mexico than the US.*

    \*   \*   \*

4
5      [Grossbard:]  Well, Hy's Law, just by way of background, Hy's Law is
   named after Hy Zimmerman, who noted that when transaminases are elevated and
6  patients are jaundiced, that's bad. And so, FDA has taken that to be a benchmark for
   significant liver toxicity.

7      \*   \*   \*

8  [O]ur drug does have a liver signal . . . .

9      \*   \*   \*

10      [Unidentified Audience Member:]  Hypertension – can you give us the range
    – ?
11
12      [Grossbard:]  Okay, well, hypertension is a clinical definition that people
    have –are attached to people who have high blood pressure. There is [sic] numerous
13  government guidelines about blood pressure that should be treated and so on and so
    on.

14      \*   \*   \*

15  And we have noted, and it is in the paper that's coming out in the next two weeks,
    that our drug at doses of 100 mg twice a day, for example, over 12 weeks has an
16  average increase in blood pressure of about 4 mm systolic relative to their baseline.

17      51.  In response to this previously undisclosed negative information, the price of the

18  Company's stock declined 38% from $14.41 on October 24, 2008 to $8.84 on October 27, 2008.

19  Analysts following the Company issued reports in which they wrote that the previously undisclosed

20  negative information raised questions about the efficacy and safety of the drug and caused the stock

21  price to plummet.

22      52.  In an October 28, 2008 report, RBC analyst Jason Kantor downgraded the stock due

23  to "heightened safety concerns for R788," and noted that (1) the impact of the Mexican data may

24  have overstated the dose response, (2) the previously undisclosed increase in blood pressure was

25  viewed as a "potentially significant concern" to independent physicians attending the October 27,

26  2008 ACR conference, and (3) the new negative information caused one pharmaceutical company to

27  walk away from a potential partnership with Rigel.

28

1       53.     Similar reports were issued by SIG Susquehanna analyst Derek Jellinek,

2 Oppenheimer analyst Brian Abrahams, Jeffries & Company analyst Adam A. Walsh, Merrill Lynch

3 analyst Andrew Berens and Credit Suisse analyst Michael Aberman. Credit Suisse analyst Aberman

4 reported that Rigel had presented the differences in efficacy in Mexico versus the U.S. for the first

5 time and that it was a particular concern because the ratio of Mexican patients to U.S. patients was

6 higher in the higher dosing groups which could skew the data in favor of R788. He also reported

7 that the magnitude of the increase in blood pressure was disclosed for the first time and that there

8 was no question the increase in blood pressure was one of the risks of the program. Aberman wrote

9 that it was an issue because of the FDA's increased scrutiny over cardiac toxicity and the well

10 known association of elevated blood pressure with cardiac events. He also wrote that one

11 investigator suggested that the elevated blood pressure would be a show stopper clinically.

12       54.     Merrill Lynch analyst Berens reported that the detailed presentation revealed a

13 modest, dose-related blood pressure increase with R788, an imbalance in response rates noted at the

14 Mexican trial sites, and more granularity on elevated liver enzymes noted with R788, which were

15 likely to increase regulatory risk for the drug and which could delay a partnership with a large

16 pharma/biotech company.

17       55.     On November 3, 2008, Rigel reported its financial results for the quarter ending

18 September 30, 2008. The Company also held its first ever earnings conference call but the focus of

19 the call was the toxicity concerns with R788 following the ACR presentation. Analysts following

20 the Company asked numerous questions about the increase in blood pressure and then issued reports.

21 Credit Suisse analyst Aberman issued a report on November 3, 2008 in which he wrote that "[b]ased

22 on the questions on the call, investors clearly remain wary over the toxicity profile of R788 and we

23 think this may not wane until (1) a commercial partnership is signed in 1H09, and/or (2) Phase IIb

24 data are released in 3Q09." He also wrote that "There is no question that the elevated blood pressure

25 seen in the Phase IIa is a risk for the long term prospects of R788."

26                                      **LOSS CAUSATION/ECONOMIC LOSS**

27       56.     During the Class Period, as detailed herein, defendants made false and misleading

28 statements by means of concealment and obfuscation of critical clinical trial data and engaged in a

1   scheme to deceive the market. This artificially inflated Rigel's stock price and operated as a fraud or
2   deceit on the Class. Later, when defendants' prior misrepresentations and fraudulent conduct
3   became apparent to the market, Rigel's stock price fell precipitously, as the prior artificial inflation
4   came out of the stock price over time. As a result of their purchases of Rigel securities during the
5   Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under
6   the federal securities laws.

7                                  **NO SAFE HARBOR**

8        57.    Rigel's verbal "Safe Harbor" warnings accompanying its oral forward-looking
9   statements ("FLS") issued during the Class Period were ineffective to shield those statements from
10  liability.

11       58.    The defendants are also liable for any false or misleading FLS pled because, at the
12  time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was
13  authorized and/or approved by an executive officer of Rigel who knew that the FLS was false. None
14  of the historic or present tense statements made by defendants was an assumption underlying or
15  relating to any plan, projection or statement of future economic performance, as they were not stated
16  to be such assumptions underlying or relating to any projection or statement of future economic
17  performance when made, nor were any of the projections or forecasts made by defendants expressly
18  related to or stated to be dependent on those historic or present tense statements when made.

19                  **APPLICABILITY OF PRESUMPTION OF RELIANCE:**
                            **FRAUD ON THE MARKET**
20
21       59.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-
    market doctrine in that, among other things:
22
23            (a)    Defendants made public misrepresentations or failed to disclose material facts
    during the Class Period;
24
25            (b)    The omissions and misrepresentations were material;

26            (c)    The Company's stock traded in an efficient market;

27            (d)    The misrepresentations alleged would tend to induce a reasonable investor to
    misjudge the value of the Company's stock; and
28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                           - 15 -

1          (e)     Plaintiff and other members of the Class purchased Rigel securities between
2  the time defendants misrepresented or failed to disclose material facts and the time the true facts
3  were disclosed, without knowledge of the misrepresented or omitted facts.

4      60.    At all relevant times, the market for Rigel securities was efficient for the following
5  reasons, among others:

6          (a)     As a regulated issuer, Rigel filed periodic public reports with the SEC; and

7          (b)     Rigel regularly communicated with public investors via established market
8  communication mechanisms, including through regular disseminations of press releases on the major
9  news wire services and through other wide-ranging public disclosures, such as communications with
10  the financial press, securities analysts and other similar reporting services.

11                              **CLASS ACTION ALLEGATIONS**

12      61.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules
13  of Civil Procedure on behalf of all persons who purchased Rigel securities during the Class Period
14  (the "Class"), including all persons who acquired the common stock of Rigel pursuant and/or
15  traceable to a false and misleading Registration Statement issued in connection with the Company's
16  February 2008 Offering. Excluded from the Class are defendants, directors and officers of Rigel and
17  their families and affiliates.

18      62.    The members of the Class are so numerous that joinder of all members is
19  impracticable. The disposition of their claims in a class action will provide substantial benefits to
20  the parties and the Court. Rigel had more than 36 million shares of stock outstanding owned by
21  thousands of persons.

22      63.    There is a well-defined community of interest in the questions of law and fact
23  involved in this case. Questions of law and fact common to the members of the Class which
24  predominate over questions which may affect individual Class members include:

25          (a)     Whether the 1933 and 1934 Acts were violated by defendants;

26          (b)     Whether defendants omitted and/or misrepresented material facts;

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 16 -

1    (c) Whether defendants' statements omitted material facts necessary in order to

2 make the statements made, in light of the circumstances under which they were made, not

3 misleading;

4    (d) Whether defendants knew or recklessly disregarded that their statements were

5 false and misleading;

6    (e) Whether the prices of Rigel securities were artificially inflated; and

7    (f) The extent of damage sustained by Class members and the appropriate

8 measure of damages.

9   64. Plaintiff's claims are typical of those of the Class because plaintiff and the Class

10 sustained damages from defendants' wrongful conduct.

11   65. Plaintiff will adequately protect the interests of the Class and has retained counsel

12 who are experienced in class action securities litigation.  Plaintiff has no interests which conflict

13 with those of the Class.

14   66. A class action is superior to other available methods for the fair and efficient

15 adjudication of this controversy.

16              **COUNT I**

17      **For Violation of §10(b) of the 1934 Act and Rule 10b-5**
     **Against Defendants Rigel, Gower, Maynard, Payan, Grossbard and Rodriguez**

18

   67. Plaintiff incorporates ¶¶1-66 by reference.

19

   68. During the Class Period, the defendants named in this Count disseminated or

20

approved the false statements specified above, which they knew or recklessly disregarded were

21

misleading in that they contained misrepresentations and failed to disclose material facts necessary

22

in order to make the statements made, in light of the circumstances under which they were made, not

23

misleading.

24

   69. These defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

25

    (a) Employed devices, schemes, and artifices to defraud;

26

27

28

1         (b)    Made untrue statements of material facts or omitted to state material facts
2 necessary in order to make the statements made, in light of the circumstances under which they were
3 made, not misleading; or

4         (c)    Engaged in acts, practices, and a course of business that operated as a fraud or
5 deceit upon plaintiff and others similarly situated in connection with their purchases of Rigel
6 securities during the Class Period.

7     70.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of
8 the market, they paid artificially inflated prices for Rigel securities.  Plaintiff and the Class would
9 not have purchased Rigel securities at the prices they paid, or at all, if they had been aware that the
10 market prices had been artificially and falsely inflated by defendants' misleading statements.

11     71.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and
12 the other members of the Class suffered damages in connection with their purchases of Rigel
13 securities during the Class Period.

14 **COUNT II**

15 **For Violation of §20(a) of the 1934 Act**
16 **Against Rigel and the Individual Defendants**

    72.    Plaintiff incorporates ¶¶1-71 by reference.

17     73.    The Individual Defendants acted as controlling persons of Rigel within the meaning
18 of §20 of the 1934 Act.  By virtue of their positions and their power to control public statements
19 about Rigel, the Individual Defendants had the power and ability to control the actions of Rigel and
20 its employees.  Rigel controlled the Individual Defendants and its other officers and employees.  By
21 reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

22 **COUNT III**

23 **Violations of §11 of the 1933 Act**
24 **Against All Defendants, Except Grossbard and Rodriguez**

25     74.    Plaintiff repeats and realleges each and every allegation contained above.
26     75.    This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of
27 the Class, against all defendants except Grossbard and Rodriguez.  For purposes of this Count,
28 plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS    - 18 -

1 | intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or
2 | negligence under the 1933 Act.

3 |      76.     The Registration Statement was false and misleading, contained untrue statements of
4 | material facts, omitted to state other facts necessary to make the statements made not misleading,
5 | and omitted to state material facts required to be stated therein.

6 |      77.     Rigel is the registrant for the Offering. As issuer of the shares, Rigel is strictly liable
7 | to plaintiff and the Class for the misstatements and omissions.

8 |      78.     The Individual Defendants named herein were responsible for the contents and
9 | dissemination of the Registration Statement. Each of the Individual Defendants named in this Count
10 | signed or authorized the signing of the Registration Statement. None of the defendants named herein
11 | made a reasonable investigation or possessed reasonable grounds for the belief that the statements
12 | contained in the Registration Statement were true and without omissions of any material facts and
13 | were not misleading.

14 |      79.     By reason of the conduct herein alleged, each of these defendants violated, and/or
15 | controlled a person who violated, §11 of the 1933 Act.

16 |      80.     Plaintiff acquired Rigel shares pursuant and/or traceable to the Registration Statement
17 | for the Offering.

18 |      81.     Plaintiff and the Class have sustained damages. At the time of their purchases of
19 | Rigel shares, plaintiff and other members of the Class were without knowledge of the facts
20 | concerning the wrongful conduct alleged herein and could not have reasonably discovered those
21 | facts prior to October 27, 2008. Less than one year has elapsed from the time that plaintiff
22 | discovered or reasonably could have discovered the facts upon which this complaint is based to the
23 | time that plaintiff filed this complaint. Less than three years elapsed between the time that the
24 | securities upon which this Count is brought were offered to the public and the time plaintiff filed this
25 | complaint.

26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT IV

### For Violations of §12(a)(2) of the 1933 Act
### Against All Defendants, Except Grossbard and Rodriguez

82. Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein. For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

83. By means of the defective Prospectus, the defendants named in this Count assisted in the sale of shares of the Company's securities to plaintiff and other members of the Class.

84. The Prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed plaintiff and the other members of the Class who purchased Rigel securities pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

85. Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time it acquired the Company's securities.

86. By reason of the conduct alleged herein, defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased Rigel common stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of Rigel stock. Accordingly, plaintiff and the other members of the Class who hold such stock have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to the defendants sued herein. Class members who have sold their shares seek damages to the extent permitted by law.

1

**COUNT V**

2

**Violations of §15 of the 1933 Act**
**Against the Individual Defendants, Except Grossbard and Rodriguez**

3

4

87.     Plaintiff repeats and realleges each and every allegation contained above.

5

88.     This Count is brought pursuant to §15 of the 1933 Act against the Individual

6

Defendants, except Grossbard and Rodriguez.

7

89.     Each of the Individual Defendants named in this Count was a control person of Rigel

8

by virtue of his position as a director and/or senior officer of Rigel which allowed each of these

9

defendants to exercise control over Rigel and its operations.

10

90.     Each of the Individual Defendants was a participant in the violations of §11 of the

11

1933 Act alleged in the Count above, based on their having signed or authorized the signing of the

12

Registration Statement and having otherwise participated in the process which allowed the Offering

13

to be successfully completed.

**PRAYER FOR RELIEF**

14

WHEREFORE, plaintiff prays for relief and judgment, as follows:

15

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

16

B.     Awarding plaintiff and the members of the Class damages and interest;

17

C.     With respect to Count IV, ordering rescission or rescissory damages for purchasers of

18

Rigel common stock in the Offering;

19

D.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

20

E.     Awarding such equitable and/or injunctive or other relief as the Court may deem just

21

and proper.

22

23

24

25

26

27

28

1    **JURY DEMAND**

2        Plaintiff hereby demands a trial by jury.

3    DATED: February 6, 2009                    COUGHLIN STOIA GELLER
                                                RUDMAN & ROBBINS LLP
4                                               CHRISTOPHER P. SEEFER
                                                DANIEL J. PFEFFERBAUM
5

6

7                                               CHRISTOPHER P. SEEFER

8                                               100 Pine Street, Suite 2600
                                                San Francisco, CA 94111
9                                               Telephone: 415/288-4545
                                                415/288-4534 (fax)
10
                                                COUGHLIN STOIA GELLER
11                                                RUDMAN & ROBBINS LLP
                                                DARREN J. ROBBINS
12                                              MATTHEW P. MONTGOMERY
                                                655 West Broadway, Suite 1900
13                                              San Diego, CA 92101-3301
                                                Telephone: 619/231-1058
14                                              619/231-7423 (fax)

15                                              Attorneys for Plaintiff

16   S:\CptDraft\Securities\Cpt Rigel Fed.doc

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    - 22 -

1

**CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

2

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

3

named parties, there is no such interest to report.

4

ATTORNEY OF RECORD FOR PLAINTIFF
INTER-LOCAL PENSION FUND GCC/IBT

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

INTER-LOCAL PENSION FUND GCC/IBT ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.    (a)    Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Operative Plasterers and Cement Masons Int'l Assoc. Local 262 Annuity Fund v. Lehman Brothers Holdings Inc., et al.*, No. 08-CV-5523 (S.D.N.Y.)

*Coyne v. General Electric Company, et al.*, No. 3:08-cv-01135-SRU (D. Conn.)

(b)    Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*City of Dearborn Heights Act 345 Police & Fire Retirement System v. Waters Corporation, et al.*, No. 1:08-cv-11889 (D. Mass)

(c)    Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Reimer v. Ambac Financial Group, Inc., et al.*, No. 1:08-cv-00411-NRB (S.D. N.Y.)

*In re First Marblehead Corporation Sec. Litig.*, No. 08-10612-JLT (D. Mass.)

RIGI.

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __5__ day of _February_, 2009.

INTER-LOCAL PENSION FUND
GCC/IBT

By: _____

Its:   _Executive Director_

- 2 -

RIGHI.

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Pri e |
|---|---|---|
| 01/31/2008 | 3,590 | $27 )0 |
| 02/01/2008 | 900 | $27 37 |
| 02/01/2008 | 1,200 | $27 36 |