1 | COUGHLIN STOIA GELLER
2 |   RUDMAN & ROBBINS LLP
  | CHRISTOPHER P. SEEFER (201197)
3 | D. CAMERON BAKER (154432)
  | DANIEL J. PFEFFERBAUM (248631)
4 | S. ASHAR AHMED (256711)
  | 100 Pine Street, Suite 2600
5 | San Francisco, CA 94111
  | Telephone: 415/288-4545
6 | 415/288-4534 (fax)
  | chriss@csgrr.com
7 | cbaker@csgrr.com
  | dpfefferbaum@csgrr.com
8 | aahmed@csgrr.com

9 | Lead Counsel for Plaintiff

10 | UNITED STATES DISTRICT COURT

11 | NORTHERN DISTRICT OF CALIFORNIA

12 | In re RIGEL PHARMACEUTICALS, INC.     ) No. 3:09-cv-00546-JSW
   | SECURITIES LITIGATION                 )
13 | _____  ) CLASS ACTION
   |                                       )
14 | This Document Relates To:             ) PLAINTIFF'S OPPOSITION TO MOTION
   |                                       ) TO DISMISS OF RIGEL AND INDIVIDUAL
15 |        ALL ACTIONS.                    ) DEFENDANTS
   | _____  )
16 |                                         DATE:        December 4, 2009
   |                                         TIME:        9:00 a.m.
17 |                                         COURTROOM:   The Honorable
   |                                                      Jeffrey S. White
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     SUMMARY OF THE COMPLAINT..................................................................3

III.    STANDARD OF REVIEW ..................................................................................4

IV.     ARGUMENT ........................................................................................................5

        A.      Defendants Made Materially False and Misleading Statements About the
                Results of the R788 Phase IIa Clinical Trial.............................................5

                1.      Defendants Reported Materially Misleading Efficacy Results by
                        Concealing the Differing Response Rates Between Mexican and
                        U.S. Patients....................................................................................6

                2.      Defendants Reported Materially Misleading Safety Results by
                        Concealing Adverse Safety Information........................................10

                3.      The Concealed Adverse Safety Information Was Material .....................16

                4.      Defendants' Other Factual Assertions Are Unsupported by the
                        Authority upon Which They Rely................................................18

                5.      Plaintiff's Allegations When Viewed as a Whole Demonstrate
                        Material Falsity ...........................................................................20

        B.      Plaintiff Has Alleged Facts Raising a Strong Inference of Scienter....................20

        C.      The Underwriter Defendants Are Liable for the Material Misstatements
                and Omissions in the Registration Statement ........................................23

        D.      Defendants' Statements Regarding Partnership Discussions Being on
                Track Are Statements of Current Business Conditions .........................24

        E.      Plaintiff Acquired Stock Through the Offering....................................24

        F.      Plaintiff Has Alleged a Primary Violation and Therefore May Assert
                Control Person Claims Under Sections 20(a) and 15 ............................25

V.      CONCLUSION....................................................................................................25

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**CASES**

4

5 *Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002)......................................................................21

6 *Barrie v. Intervoice-Brite, Inc.*,
    409 F.3d 653 (5th Cir. 2005) ......................................................................5

7

8 *Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)....................................................................................8

9 *Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008)............................................................4, 19, 20

10

11 *Bouriaily v. United States*,
    483 U.S. 171 (1987)..................................................................................20

12 *Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002)................................................................7, 19

13

14 *Commc'ns Workers of Am. Plan for Employees' Pensions & Death Benefits v.*
    *CSK Auto Corp.*,
    525 F. Supp. 2d 1116 (D. Ariz. 2007) ......................................................4

15

16 *Constr. Laborers Pension Trust of Greater St. Louis v. Neurocrine Biosciences, Inc.*,
    No. 07CV1111-IEG RBB, 2008 WL 2053733
    (S.D. Cal. May 13, 2008)..........................................................................22

17

18 *Eminence Capital, L.L.C. v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ..................................................................25

19 *Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ..............................................................10, 18

20

21 *Glenbrook Capital Ltd. P'ship v. Kuo*,
    No. C07-02377 JSW, 2009 U.S. Dist. LEXIS 30745
    (N.D. Cal. Mar. 30, 2009)..........................................................................4

22

23 *Helwig v. Vencor, Inc.*,
    251 F.3d 540 (6th Cir. 2001) ......................................................................7

24 *Herman & Maclean v. Huddleston*,
    459 U.S. 375 (1983)..................................................................................23

25

26 *Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ..............................................................20, 21

27 *In re Apollo Group Inc. Sec. Litig.*,
    395 F. Supp. 2d 906 (D. Az. 2005)............................................................20

28

1

2                                                                                   **Page**

3  *In re Apple Computer Sec. Litig.,*
        886 F.2d 1109 (9th Cir. 1989) ...................................................................8
4

5  *In re Carter-Wallace, Inc. Sec. Litig.,*
        150 F.3d 153 (2d Cir. 1998)...................................................................17
6

   *In re Charles Schwab Corp. Sec. Litig.,*
        257 F.R.D. 534 (N.D. Cal. 2009)...........................................................25
7

8  *In re Connectics Corp. Sec. Litig.,*
        No. C07-02940 SI, 2008 U.S. Dist. LEXIS 62515
9       (N.D. Cal. Aug. 14, 2008)......................................................................16

   *In re Cornerstone Propane Partners, L.P. Sec. Litig.,*
10      355 F. Supp. 2d 1069 (N.D. Cal. 2005) .................................................22

11 *In re CV Therapeutics, Inc., Sec. Litig.,*
        No. C03 3709 SI, 2004 U.S. Dist. LEXIS 98244
12      (N.D. Cal. Apr. 4, 2007) ..................................................................20, 24

13 *In re Daou Sys., Inc., Sec. Litig.,*
        411 F.3d 1006 (9th Cir. 2005) ...................................................................4
14

15 *In re Fuwei Films Sec. Litig.,*
        No. 07 CW 9416 (RJS), 2009 U.S. Dist. LEXIS 59658
16      (S.D.N.Y. July 10, 2009) ........................................................................23

17 *In re Gilead Scis. Sec. Litig.,*
        536 F.3d 1049 (9th Cir. 2008) ...................................................................4

18 *In re Immune Response Sec. Litig.,*
        375 F. Supp. 2d 983 (S.D. Cal. 2005)...........................................8, 10, 11
19

20 *In re Intrabiotics Pharms., Inc. Sec. Litig.,*
        No. C 04 02675 JSW, 2006 WL 2192109
21      (N.D. Cal. Aug. 1, 2006).........................................................................17

22 *In re Nuko Info. Sys., Inc., Sec. Litig.,*
        199 F.R.D. 338 (N.D. Cal. 2000).............................................................23

23 *In re Pixar Sec. Litig.,*
        450 F. Supp. 2d 1096 (N.D. Cal. 2006)...................................................23
24

25 *In re Regeneron Pharms., Inc. Sec. Litig.,*
        No. 03-Civ-3111 (RWS), 2005 U.S. Dist. LEXIS 1350
26      (S.D.N.Y. Feb. 3, 2005)............................................................................9

27 *In re Secure Computing Corp. Sec. Litig.,*
        184 F. Supp. 2d 980 (N.D. Cal. 2001) ....................................................24

28

**Page**

*In re Sepracor, Inc. Sec. Litig.,*
    308 F. Supp. 2d 20 (D. Mass. 2004) ...........................................................................16

*In re Stac Elecs. Sec. Litig.,*
    89 F.3d 1399 (9th Cir. 1996) .....................................................................................23

*In re U.S. Aggregates, Inc., Sec. Litig.,*
    No. C01 1688 CW, 2003 U.S. Dist. LEXIS 12168
    (N.D. Cal. Jan. 24, 2003) .....................................................................................21, 23

*In re Viropharma, Inc., Sec. Litig.,*
    No. 02-1627, 2003 U.S. Dist. LEXIS 5623
    (E.D. Pa. Apr. 3, 2003) ...............................................................................................9

*In re Worldcom, Inc. Sec. Litig.,*
    346 F. Supp. 2d 628 (S.D.N.Y. 2004)...................................................................23, 24

*Kaplan v. Rose,*
    49 F.3d 1363 (9th Cir. 1994) .......................................................................................7

*Lipton v. Pathogenesis Corp.,*
    284 F.3d 1027 (9th Cir. 2002) ...............................................................................21, 22

*Masters v. GlaxoSmithKline,*
    271 Fed. Appx. 46 (2d Cir. 2008) ...............................................................................18

*McGuire v. Dendreon Corp.,*
    No. C07-800 MJP, 2008 U.S. Dist. LEXIS 98773
    (W.D. Wa. Dec. 5, 2008) ........................................................................................5, 6

*McMahan & Co. v. Wherehouse Entm't, Inc.,*
    900 F.2d 576 (2nd Cir. 1990)......................................................................................20

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.*
    *Am. West Airlines, Inc.,*
    320 F.3d 920 (9th Cir. 2003) ..........................................................................8, 16, 22, 23

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,*
    380 F.3d 1226 (9th Cir. 2004) .....................................................................................20

*Oran v. Stafford,*
    226 F.3d 275 (3d Cir. 2000).........................................................................................9

*Padnes v. Scios Nova, Inc.,*
    No. C 95 1693 MHP, 1996 WL 539711
    (N.D. Cal. Sept. 18, 1996) .....................................................................................18, 19

*SEC v. Phan,*
    500 F.3d 895 (9th Cir. 2007) .......................................................................................8

**Page**

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..............................................................................4

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)........................................................................9, 18

*Twinde v. Threshold Pharms., Inc.*,
    No. C 07 4972 CW, 2008 WL 2740457
    (N.D. Cal. July 11, 2008) ....................................................................18

*Vess v. Ciba-Geigy Corp., USA*,
    317 F.3d 1097 (9th Cir. 2003) .............................................................23

*Warshaw v. Xoma*,
    74 F.3d 955 (9th Cir. 1996) ...................................................................8

*Zucco Partners, LLC v. Digimarc Corp.*,
    No. 06 35758, 2009 U.S. App. LEXIS 583
    (9th Cir. Jan. 12, 2009) .......................................................................22

**STATUTES, RULES AND REGULATIONS**

15 U.S.C. §77
    §77...............................................................................................1, 3, 23

15 U.S.C. §78
    §78u-4(b)(1) ...................................................................................1, 3, 4

15 U.S.C.A. §77
    §77k(b)(3) ...........................................................................................23
    §77l(a)(2) .............................................................................................23

Private Securities Litigation Reform Act of 1995,
    Pub. L. No. 104-67, 109 Stat. 737 (1995).............................................4

Federal Rules of Civil Procedure
    Rule 9(b) .............................................................................................23

## I.       INTRODUCTION

This is a securities class action on behalf of all persons who acquired the securities of Rigel Pharmaceuticals, Inc. ("Rigel" or the "Company") between December 13, 2007 and February 3, 2009 (the "Class Period"), including persons who acquired common stock pursuant or traceable to a false and misleading registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's February 2008 offering (the "Offering"). ¶1.[1] Plaintiff Inter-Local Pension Fund GCC/IBT asserts negligence claims under the Securities Act of 1933 ("1933 Act") and fraud claims under the Securities Exchange Act of 1934 ("1934 Act") against Rigel, its senior insiders and the investment banks that underwrote the Offering. *Id.*[2]

Rigel is a small, clinical stage drug development company founded in 1996 that identifies potential drug candidates and commences the process of clinically testing its drug candidates for efficacy and safety.  At issue are statements made by Rigel, its officers, directors and underwriters from December 13, 2007 through October 26, 2008 regarding the results of a Phase IIa clinical trial of its leading drug candidate, R788, for treatment of rheumatoid arthritis (RA).  At the outset, Rigel was headed toward bankruptcy and needed to urgently raise funds.  The situation had been exacerbated by the disclosure in November 2007 that R788 caused adverse side effects when used to treat immune thrombocytopenic purpura ("ITP"), which caused a 40% drop in Rigel's stock price. Rigel's future and that of the officer defendants, thus, hinged on the R788 Phase IIa results for RA, which were to be released in December 2007.  When defendants received those results internally, they knew that publication could be the end of Rigel and their jobs, so they elected to falsely portray the results by disclosing only the positive information.

---

[1]       All paragraph ("¶") references are to the Consolidated Complaint for Violations of the Federal Securities Laws ("Complaint"), filed on July 24, 2009.

[2]       The officer defendants are James Gower (Chairman of the Board of Directors and CEO), Ryan Maynard (CFO), Donald Payan (EVP for research), Raul Rodriguez (EVP and COO), and Dr. Elliot Grossbard (EVP and Chief Medical Officer).  ¶¶24-28.  The director defendants are Jean Deleage, Bradford Goodwin, Gary Lyons, Walter Moos, Hollings Renton, Peter Ringrose and Stephen Sherwin.  ¶¶29-35.  The underwriter defendants are Credit Suisse Securities (USA) LLC, Oppenheimer & Co. Inc., Thomas Weisel Partners LLC and Jefferies & Company, Inc.  ¶¶37-40. Unless otherwise specified, the term "defendants" will refer to the officer defendants and Rigel.

1   Defendants represented the efficacy results were very strong but concealed significantly

2   different results from the Mexican patients (very high response rates) and U.S. patients (mediocre

3   response rates), which is known as a "country interaction."  On the safety side, they concealed the

4   critical blood pressure side effect and underreported other adverse safety information.  In response to

5   the misleading Phase IIa results that defendants reported, Rigel's stock price tripled from $8.00 per

6   share on December 12, 2007 to $25.95 on December 13, 2007.  Defendants used the reported Phase

7   IIa results to raise capital for Rigel via a secondary offering of five million shares at $27.00 per

8   share.

9   Investors got a rude shock on October 27, 2008, when the true Phase IIa results were

10   disclosed.  The market's negative reaction to the differing response rates and complete adverse

11   safety information confirmed the previously concealed information was material.  Rigel's stock price

12   declined 38% to $8.84 and would have dropped farther but for Gower's reassurances regarding a

13   likely partnership.   That shoe dropped on February 3, 2009, when defendants reported a

14   postponement of partnership discussions until the Phase IIb clinical study was complete.  The stock

15   price dropped to $6.50 after that disclosure.  While investors incurred substantial losses on their

16   purchased Rigel stock, the officer defendants not only kept their jobs, but gave themselves raises,

17   substantial bonuses and valuable stock options.   The underwriter defendants also profited

18   handsomely, pocketing $7 million from the Offering.

19   Investors now seek to recover for the officer defendants' fraud and the negligence of the

20   director defendants and the underwriter defendants.  The fraud is readily apparent: the officer

21   defendants with knowledge of the adverse Phase IIa results nonetheless misled the investing public

22   about those material results for their own personal gain and to save the Company.  Likewise, the

23   negligence is readily apparent: if the director defendants and the underwriter defendants had acted in

24   a reasonable and diligent fashion, the officer defendants would not have been able to dupe plaintiff

25   and others into investing in the Offering at $27.00 per share.

26   Despite this compelling background, defendants in *pro forma* fashion challenge plaintiff's

27   allegations of falsity, materiality and scienter.  As to falsity, there is a stark distinction between how

28   defendants portrayed the Phase IIa results to the market and the true results.  The materiality

1   argument is even weaker as it is clear that the RA Phase IIa results would be and were critical to the

2   market, a point confirmed by the market reactions on December 13, 2007 (when defendants first

3   misrepresented the Phase IIa results) and on October 27, 2008 (when the market learned the truth).

4   And as to scienter, defendants rest entirely on the lack of insider sales, which plaintiff does not

5   allege, and wholly ignore detailed allegations of their undisputed knowledge of the concealed

6   information and their personal motives to deceive the market.

7        The particularized allegations, viewed collectively and construed in plaintiff's favor, are

8   more than sufficient to state a claim under §§11, 12(a)(2) and 15 of the 1933 Act and §§10(b) and

9   20(a) of the 1934 Act.  Defendants' motion to dismiss should be denied.

10  **II.    SUMMARY OF THE COMPLAINT**

11       Because the facts alleged in the Complaint are explained in detail in the Argument section of

12  this brief, only a short description is included here.  Plaintiff alleges that defendants made materially

13  false and misleading statements about the results of the R788 Phase IIa clinical trial by concealing

14  (1) differing response rates between Mexican and U.S. patients; and (2) adverse safety information.

15  ¶¶4-6, 48-125.  The false positive results were initially reported on December 13, 2007 and caused

16  the price of the Company's stock to triple.  ¶¶5, 48-52.  That allowed Rigel to raise $135 million in

17  the Offering, which the Company needed to avoid insolvency.  ¶¶88-92, 109-119.  False and

18  misleading statements about the R788 Phase IIa clinical trial were included in the Registration

19  Statement and made during subsequent investor conferences.  ¶¶109-125.

20       On October 27, 2008, Rigel revealed the previously concealed differing response rates and

21  adverse safety information.  ¶126.  Analysts downgraded the Company's stock and reported that the

22  new negative information was "confounding" and raised significant concerns about the efficacy and

23  safety of R788, whether Rigel would be able to close a partnership and the ultimate

24  commercialization of R788.  ¶¶127-132.  The Company's stock price declined 38% and would have

25  declined further if not for the reassurances that the Company was still on track for putting a

26  partnership in place in the early part of 2009.  ¶¶15-16, 132, 137.  On February 3, 2009, however,

27  Rigel reported that it would delay partnership discussions until 2010, and the stock price declined

28  9.3%, closing at $6.50 per share.  ¶¶17, 132, 138.

1   **III.     STANDARD OF REVIEW**

2           In considering a motion to dismiss, the court accepts plaintiff's allegations as true and

3   construes them in the light most favorable to plaintiff. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049,

4   1055 (9th Cir. 2008).  Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), to

5   assert a violation of §10(b), plaintiff must "'plead with particularity both falsity and scienter,'"

6   which are generally strongly inferred from the same facts. *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d

7   1006, 1014 (9th Cir. 2005).[3]  To plead falsity, plaintiff must identify the statements at issue and "the

8   reason or reasons why the statement is misleading."  15 U.S.C. §78u-4(b)(1); *Glenbrook Capital Ltd.*

9   *P'ship v. Kuo*, No. C07-02377 JSW, 2009 U.S. Dist. LEXIS 30745, at *15 (N.D. Cal. Mar. 30,

10  2009).

11          Plaintiff must also "'state with particularity facts giving rise to a strong inference' that

12  defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of

13  misleading investors." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).  To

14  qualify as "strong," an inference of scienter must be more than merely plausible or reasonable – it

15  must be cogent and at least as compelling and as likely as any opposing inference of scienter.

16  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  Under *Tellabs*, where there

17  are equally strong inferences for and against scienter, "a tie goes to the Plaintiff." *Commc'ns*

18  *Workers of Am. Plan for Employees' Pensions & Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d

19  1116, 1120 (D. Ariz. 2007).  In determining whether there is a strong inference of scienter, the court

20  "must consider the complaint in its entirety" and determine "whether ***all*** of the facts alleged, taken

21  collectively, give rise to a strong inference of scienter, not whether any individual allegation,

22  scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original).

23

24

25

26   _____

27   [3]     Citations are omitted unless otherwise indicated.

28

IV.    **ARGUMENT**

   A.    **Defendants Made Materially False and Misleading Statements About the Results of the R788 Phase IIa Clinical Trial**

   During the Class Period, defendants represented that the results of the R788 Phase IIa clinical study demonstrated significant improvement in RA patients and also reported adverse safety data regarding R788's effect on hypertension, liver enzymes, neutropenia, diarrhea and gastrointestinal ("GI") side effects.  ¶¶4, 48-50.[4]  The statements were materially false and misleading because defendants failed to disclose critical adverse information.  ¶¶53-74.  Specifically, they failed to disclose that (1) patients in Mexico had higher response rates in both the placebo and treated arms than the U.S. patients, which may have contributed disproportionately to the overall reported benefit observed at the higher doses, as nearly all patients in the 150mg cohort and no patients in the 50mg cohort were from Mexico; (2) there was a dose-dependent increase in blood pressure, as high as 20-30mmHg and five patients (not two as reported) experienced hypertension, which was important because it could signal an increase in cardiovascular risk, the mechanism that caused the increase was not well understood and the increase in blood pressure could be a stumbling block for some pharmaceutical companies that were considering licensing the drug; (3) nine patients (not three, as reported on December 13, 2007) experienced increased liver enzymes compared to patients taking the placebo; (4) 20 patients (not 15, as reported on December 13, 2007) experienced neutropenia; (5) 34 patients (not 15, as reported on December 13, 2007) experienced diarrhea; and (6) 35 patients

---

[4]    Defendants assert incorrectly that Maynard and Payan did not make or prepare any of the alleged fraudulent statements and thus, cannot be liable under §10(b).  Rigel and Individual Defendants' Motion to Dismiss Consolidated Complaint ("MTD") at 12 n.6.  However, both Maynard and Payan attended the December 13, 2007 conference call with analysts, where Gower and Grossbard made statements that Maynard and Payan knew were false and misleading.  ¶49; Declaration of Shannon M. Eagan ("Eagan Decl."), Ex. C.  Because Maynard and Payan failed to correct statements they knew to be false and misleading, they are liable for those false and misleading statements.  *Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653, 656 (5th Cir. 2005) ("Where it is pled that one defendant knowingly uttered a false statement and the other defendant knowingly failed to correct it, . . . the fraud is sufficiently pleaded as to each defendant."); *accord McGuire v. Dendreon Corp.*, No. C07-800 MJP, 2008 U.S. Dist. LEXIS 98773, at *25-*26 (W.D. Wa. Dec. 5, 2008).  For the same reason, because the subject of the December 13, 2007 conference call was the false and misleading efficacy and safety data contained in the press release issued that day, these defendants are also liable for statements in the press release.

(not 15, as reported on December 13, 2007) experienced upper GI side effects. *Id*. This adverse information was not publicly disclosed until October 27, 2008. ¶126.

### 1. Defendants Reported Materially Misleading Efficacy Results by Concealing the Differing Response Rates Between Mexican and U.S. Patients

On December 13, 2007, Rigel issued a press release in which it was stated that R788 "demonstrated statistically significant results in treating RA" because patients in the 100mg and 150mg cohorts "showed higher ACR20, ACR50, ACR70 and DAS28 response rates than the placebo group." ¶48. The Company reported the following efficacy results:

|  | **Placebo** | **50MG** | **100MG** | **150MG** |
|---|---|---|---|---|
| **# of patients** | **47** | **46** | **49** | **47** |
| ACR20 | 18 (38%) | 15 (33%) | 32 (65%) | 34 (72%) |
| ACR50 | 9 (19%) | 8 (17%) | 24 (49%) | 27 (57%) |
| ACR70 | 2 (4%) | 1 (2%) | 16 (33%) | 19 (40%) |
| DAS28 | 8 (17%) | 9 (20%) | 17 (35%) | 22 (47%) |

*Id*. The efficacy results were repeated to investors during the December 13, 2007 conference call, in the Registration Statement related to the Offering, during the February 11, 2008 BIO CEO & Investor conference and during the July 8, 2008 Collins Stewart 4th Annual Growth Conference. ¶¶49-50, 112-113, 120, 123.

The statements about efficacy were misleading because defendants failed to disclose that (1) patients in Mexico had higher response rates in both the placebo and treated arms than U.S. patients; and (2) 42 of the 47 patients in the 150mg cohort were from Mexico, and no patients in the 50mg cohort were from Mexico. ¶¶54-56. The following tables show the differing response rates (¶56):

|  | **Placebo** | **50MG** | **100MG** | **150MG** |
|---|---|---|---|---|
| **# of U.S. patients** | **25** | **46** | **21** | **5** |
| ACR20 | 6 (24%) | 15 (33%) | 11 (52%) | 2 (40%) |
| ACR50 | 1 (4%) | 8 (17%) | 6 (29%) | 2 (40%) |
| ACR70 | 0 (0%) | 1 (2%) | 3 (14%) | 2 (40%) |

| | **Placebo** | **50MG** | **100MG** | **150MG** |
|---|---|---|---|---|
| **# of Mexican patients** | **22** | **0** | **28** | **42** |
| ACR20 | 12 (55%) | 0 (0%) | 21 (75%) | 32 (76%) |
| ACR50 | 8 (36%) | 0 (0%) | 18 (64%) | 25 (60%) |
| ACR70 | 2 (9%) | 0 (0%) | 13 (46%) | 17 (40%) |

That the high doses were tested almost exclusively in Mexico and that Mexican patients reported greater improvement with R788 (and placebo) than U.S. patients was important and misled investors by overstating the dose response and skewing the data in favor of R788. ¶¶59-60; *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) ("To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001) ("[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions 'assumes a duty to speak fully and truthfully on those subjects.'"); *Kaplan v. Rose*, 49 F.3d 1363, 1372 (9th Cir. 1994) (genuine issue of material fact as to whether literally true statement was misleading when there was conflicting information).

Indeed, analysts noted this was new and important negative information when it was first disclosed on October 27, 2008. ¶¶59-60. In an October 27, 2008 report, RBC Capital Markets ("RBC") analyst Jason Kantor wrote that "the formal presentation of the R788 Phase IIa data and subsequent investor event at ACR were confounded by two disclosures," including "higher placebo and on-treatment response rates among patients treated in Mexico vs. the US." ¶59. He noted that "the higher response rates at the Mexican sites may have contributed disproportionately to the benefit observed at the higher doses" and that Rigel "provided the ACR response data by country for the first time." *Id.* A Credit Suisse analyst reported the differing response rates were "a particular concern since the ratio of Mexican patients to U.S. patients was higher in the higher dosing groups, which could skew the data in favor of R788." ¶60.

Grossbard also acknowledged the country interaction was important. During the October 27, 2008 investor update, he stated that he "was concerned there might be such an interaction," that the "the response rate was much higher in Mexico," that the response rate of the five U.S. patients in the

1    150mg cohort "wasn't particularly good" and too small "to make sense out of."  ¶57; Eagan Decl.,

2    Ex. G at 3, 6, 11.  Further, in the November 2008 article about the R788 study published in *Arthritis*

3    *& Rheumatism*, it was reported that the differing response rates "require[d] additional studies to

4    validate the response rates." Eagan Decl., Ex. M at 3317.

5        In short, the country interaction put a big question mark next to the American College of

6    Rheumatology ("ACR") results and defendants knew it.  By concealing the country interaction,

7    defendants misled the market as to the expected commercial prospects of R788.  Without the

8    "confounding" country interaction, the reported ACR response data falsely suggested (1) a larger

9    potential share of the $13 billion RA market, and (2) a speedy and lucrative third-party partnership.

10   ¶¶82-86, 93-94.  These facts are more than sufficient to show that defendants' statements about the

11   efficacy of R788 were misleading.  "'[O]nly if reasonable minds could not disagree that the

12   challenged statements were not misleading should the district court dismiss under 12(b)(6).'" *In re*

13   *Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1021-22 (S.D. Cal. 2005) (quoting *Warshaw v.*

14   *Xoma*, 74 F.3d 955, 959 (9th Cir. 1996)).

15       Defendants do not dispute that they knew about the country interaction or that it was not

16   disclosed.  However, they contend that the concealed information was not material because

17   Grossbard said all that mattered was the difference in response rates between the active and control

18   groups. MTD at 14; Eagan Decl., Ex. G at 3.  Grossbard's opinion ignores the reports issued by the

19   analysts that explained why the differing response rates were material.  ¶¶59-60; *Basic Inc. v.*

20   *Levinson*, 485 U.S. 224, 231-32 (1988) (To plead materiality, plaintiff need only establish that the

21   information at issue would "'have been viewed by the reasonable investor as having significantly

22   altered the "total mix" of information made available.'"); *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir.

23   2007) (Materiality "depends on determining a hypothetical investor's reaction to the alleged

24   misstatement" and "'should ordinarily be left to the trier of fact.'") (quoting *In re Apple Computer*

25   *Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989)).  It also ignores the 200% increase in the

26   Company's stock price following the December 13, 2007 misleading disclosures, and the 38%

27   decline in the Company's stock price following the disclosure of the differing response rates on

28   October 27, 2008. ¶¶52, 127; *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am.*

1     *West Airlines, Inc.*, 320 F.3d 920, 935 (9th Cir. 2003) (Stock price reaction "further supports a

2     finding of materiality."); *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("[T]he materiality of

3     disclosed information may be measured post hoc by looking to the movement, in the period

4     immediately following disclosure, of the price of the firm's stock.").

5          Recognizing that the analysts noted the importance of the differing response rates, defendants

6     contend incorrectly that other comments by Kantor in the October 27, 2008 report "decisively

7     undercut[] any contention that the omission of country specific data in the initial disclosures could

8     possibly have been material." MTD at 14 (citing Eagan Decl., Ex. L). Kantor reported that RBC did

9     not view the efficacy differences as being a significant clinical or regulatory risk, but he did not

10    report the differing response rates were immaterial. To the contrary, he reported that the

11    presentation was "confounded" by the disclosure of the differing response rates, that the "higher

12    response rates at the Mexican sites may have contributed disproportionately to the benefit observed

13    at the higher doses," that RBC believed "the perceived risk/benefit ratio has worsened" and that, "in

14    the absence of new data, concerns are likely to persist." Eagan Decl., Ex. L at 1. Moreover, in

15    another report issued after the filing of this lawsuit, Kantor wrote: "We typically do not put much

16    emphasis on these types of lawsuits because they are often frivolous. However, the concerns raised

17    in the suit are similar to those we raised at the time the data was presented . . . ." ¶87. Kantor's

18    reports support plaintiff's allegations that the differing response rates were material and do not

19    "decisively undercut" them, as defendants contend.

20         In addition, "[i]n the context of a drug development program, courts have noted that

21    'statements regarding the overall efficacy of the drug . . . cannot be simply dismissed as immaterial'"

22    and that "'[i]t would be a sad day when [a] court could determine that misstatements about whether a

23    company's primary product worked did not alter the "total mix" of information available in the

24    market.'" *In re Regeneron Pharms., Inc. Sec. Litig.*, No. 03-Civ-3111 (RWS), 2005 U.S. Dist.

25    LEXIS 1350, at *62 (S.D.N.Y. Feb. 3, 2005) (quoting *In re Viropharma, Inc., Sec. Litig.*, No.

26    02-1627, 2003 U.S. Dist. LEXIS 5623, at *6 (E.D. Pa. Apr. 3, 2003)).

27         In any event, defendants' contentions are questions of fact that cannot be resolved on a

28    motion to dismiss. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (The determination

of materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."); *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) ("[O]nly if the adequacy of the disclosure or the materiality of the statement is 'so obvious that reasonable minds [could] not differ' are these issues 'appropriately resolved as a matter of law.'"); *Immune Response*, 375 F. Supp. 2d at 1020-21.

### 2. Defendants Reported Materially Misleading Safety Results by Concealing Adverse Safety Information

Defendants also misrepresented the Phase IIa safety results by omitting known adverse facts about blood pressure toxicity and other reported adverse side effects. The December 13, 2007 press release included a "key safety results" chart setting out the number of adverse events and represented there was "good tolerability observed in this clinical trial. . . . The most common clinically meaningful adverse events noted in the clinical trial were dose-related neutropenia, mild elevations of liver function tests, and gastrointestinal (GI) side effects." ¶48. During the subsequent conference call, Grossbard referenced the adverse event numbers, stating "[t]he incidence of neutropenia . . . was modest" and "[t]he incidence of reported moderate hypertension was quite low." ¶49. On February 11, 2008, defendant Gower stated: "The safety results were also good. We did have two dose dependent toxicities that were noted." ¶120 (noting neutropenia and GI disturbance). And on July 8, 2008, defendant Rodriguez citing the "key safety data" disclosed on December 13, 2007 stated: "You see some of the safety background on these various doses in this chart. We had some cases of neutropenia, five in the 100 milligram and 10 in the 150 milligram dose groups that required the dose to be reduced. . . . We had some GI side effects and they were somewhat random and transient, more in the 150 than the 100. A bit of hypertension here and there, but, basically, a fairly good safety profile." ¶123.

The statements about safety were materially false and misleading because defendants concealed key adverse safety information that raised serious questions about the commercial viability of R788 and the likelihood of Rigel's establishing a partnership with a pharmaceutical company to develop R788. ¶¶61-74, 93-102. For example, on December 13, 2007, Grossbard stated

1  that "the incidence of reported moderate hypertension was quite low" because there were only two

2  cases of "hypertension of moderate severity."  ¶¶48-49.  That was misleading because neither

3  Grossbard nor any of the other defendants attending the December 13, 2007 conference call

4  disclosed that five patients – not two – experienced hypertension, that the magnitude of the increases

5  in blood pressure was as high as 30mmHg, or that the increase in blood pressure was dose dependent

6  like the increase in neutropenia, the elevation of liver enzymes and the GI side effects.  ¶61.

7  Analysts noted this important difference.  In his December 13, 2007 report, Credit Suisse analyst

8  Aberman wrote that there "was no evidence of dose dependent hypertension."  *Id.*

9      Gower, Grossbard, Payan, Rodriguez and Maynard knew the undisclosed information was

10  important.  During the October 27, 2008 ACR investor update, Grossbard acknowledged that five

11  patients experienced hypertension, that blood pressure went up as much as 20-30mmHg, that the

12  increase in blood pressure was dose dependent and "of crushing importance to everybody" at the

13  ACR conference, that additional studies would be necessary to get more precise estimates and that

14  "the final word on blood pressure's pretty far down the road."  ¶62; Eagan Decl., Ex. G at 4-9.

15      Analysts reported the dose-dependent increase in blood pressure was surprising because it

16  was not previously disclosed and important because it might signal an increase in cardiovascular

17  risk; the FDA was increasing its scrutiny of cardiac toxicity; the mechanism was not well

18  understood; and it could be a stumbling block for pharmaceutical companies considering licensing

19  the drug.  ¶¶63-67.  RBC analyst Kantor downgraded Rigel's stock due to "heightened safety

20  concerns for R788" and wrote that the Company's October 27, 2008 presentation was "confounded

21  by two disclosures," including "[the] dose-dependent increase in mean systolic blood pressure of 3-

22  5mmHg at 100mg."  ¶¶64-65.  He noted that the previously undisclosed increase in blood pressure

23  was viewed as a "potentially significant concern" to independent physicians attending the ACR

24  conference and caused one pharmaceutical company to walk away from a potential partnership.  *Id.*

25      Credit Suisse analyst Aberman noted the elevated blood pressure was "an important topic of

26  debate," particularly given "the FDA's increased scrutiny over cardiac toxicity and the well known

27  association of elevated blood pressure with cardiac events."  ¶66.  "Perhaps more important," he

28  wrote, was that an investigator suggested the level of elevated blood pressure "would be a show

1   stopper clinically." ¶66. He wrote that the 20-30mmHg increase in blood pressure was "concerning

2   in that it could precipitate significant morbidity acutely, such as a cardiac event" and that the rate of

3   hypertension was "probably the biggest risk to the program." *Id*. In a subsequent report, he wrote

4   that "[t]here is no question that the elevated blood pressure seen in the Phase IIa is a risk for the long

5   term prospects of R788." ¶67. Given the unexpected negative news, Rigel's stock price declined

6   38% from $14.41 on October 24, 2008 to $8.84 on October 27, 2008. ¶127.

7         Defendants do not dispute that they concealed the total number of patients who experienced

8   hypertension, the magnitude of the increase in blood pressure and whether the incidence of the

9   reported hypertension was dose dependent. MTD at 19-20. Instead, defendants contend their

10   statements about hypertension on December 13, 2007 were accurate because Rigel only reported

11   cases of "moderate or greater" hypertension that it believed to be most relevant to clinical risk,

12   whereas the later disclosures included all cases where investigators noted any degree of

13   hypertension. *Id*. That contention is a red herring because it ignores that the reported increase in

14   blood pressure was dose dependent and that the magnitude of the increase – as much as 20-30mmHg

15   – "could precipitate significant morbidity acutely, such as a cardiac event." ¶¶63-67.[5]

16         Defendants also contend Grossbard's statement that the increase in hypertension was "of

17   crushing importance to everyone" was simply not true and just a "tongue in cheek" response to a

18   different question. MTD at 19 n.14 (citing Eagan Decl., Ex. G at 8-9). That contention is

19   unsupported. Most of the questions during the October 27, 2008 presentation focused on the five

20   cases of hypertension, the increase in blood pressure and the fact that the increase in blood pressure

21   was dose dependent. Eagan Decl., Ex. G at 4-9. In response, Grossbard stated that (1) there was "an

22

---

23   [5]   Plaintiff mistakenly alleged that "there was a dose dependent increase in average blood

24   pressure of 20-30mmHg in five patients (not two, as reported on December 13, 2007)." ¶6. The allegation should have been that "there was a dose-dependent increase in average blood pressure, the increase in blood pressure was as high as 20-30mmHg and that five patients (not two, as reported on

25   December 13, 2007) experienced hypertension." Thus, defendants correctly point out that the allegation as written in ¶6 is unsupported. MTD at 20. However, it is clearly and accurately alleged

26   in the Complaint that (1) five patients (not two, as reported on December 13, 2007) experienced hypertension; (2) the increase in blood pressure was dose dependent; and (3) the magnitude of the

27   increase in blood pressure was as high as 30mmHg. ¶¶61-67.

28

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OF RIGEL AND INDIVIDUAL
DEFENDANTS - 3:09-cv-00546-JSW          - 12 -

1   average increase in blood pressure of about 4mm systolic relative to their baseline" and 2-3mm for

2   diastolic; (2) the average increase in the 150mg cohort was 8mm systolic and 4mm diastolic;

3   (3) "there were one or two patients who had increases in systolic blood pressure in the range of

4   30mm of mercury"; (4) he believed the increase in blood pressure was a "real effect" because blood

5   pressure came pretty much down to baseline when R788 was withdrawn; and (5) there was "no

6   question" the increase in blood pressure was "dose dependent."  *Id.*

7          Then an analyst asked if the 8mm systolic increase in the 150mg cohort included patients

8   whose dose of R788 was reduced, and Grossbard stated it did and that he understood it was "of

9   crushing importance to everybody here whether it's three or five, but that's not going to be the final

10  word on blood pressure" and that "the final word on blood pressure is pretty far down the road."  *Id.*

11  at 8-9.  Viewing all of Grossbard's remarks in context shows that Grossbard knew the blood-

12  pressure data was "of crushing importance to everybody" even if his response to the analyst's

13  specific question was "tongue in cheek."  The reports issued by the analysts following the October

14  27, 2008 presentation and the substantial decline in Rigel's stock price confirm that R788's impact

15  on blood pressure was "of crushing importance to everybody."

16         Defendants imply that the new negative information about hypertension was already known

17  to the market because one analyst reported in December 2007 that mild levels of hypertension were a

18  possibility and because several analysts commented that nothing in Rigel's October 27, 2008

19  disclosures was new or surprising.  MTD at 20 n.15.  The reports issued by the analysts following

20  the October 27, 2008 presentation and the substantial decline in Rigel's stock price confirm the

21  negative information related to hypertension was not already known to the market.  Defendants cite

22  the report issued by CIBC World Markets on December 13, 2007, but all the analyst wrote in the

23  report was that Rigel did not report the rates of mild hypertension and that it would likely be

24  acceptable.  Eagan Decl., Ex. D at 4.  There was nothing in the report about the magnitude of the

25  increase in blood pressure (30mmHg) or that the increase in blood pressure was dose dependent.

26         Other analysts commented on the new adverse information.  In the October 27, 2008 Credit

27  Suisse report, Aberman wrote that "they presented the magnitude for the first time and there is no

28  question that this is still one of the risks of the program."  Eagan Decl., Ex. H at 1.  He also wrote

that there was "some new information on the break out between patients enrolled in Mexico and the U.S., as well as toxicity data." *Id.* Although Aberman noted that the dose-dependent increase in blood pressure should not have been a surprise because Rigel had talked about blood pressure before, he did not write that the dose-dependent increase in blood pressure was previously known. Indeed, in his December 13, 2007 report, Aberman wrote there was "no evidence of dose-dependent hypertension." ¶61. In a November 3, 2008 report, Aberman wrote that he was aware of the elevated blood pressure risk from the Company's December 13, 2007 report, but did not write that he knew the magnitude of the increase in blood pressure or that the increase was dose dependent. Eagan Decl., Ex. O at 2.

In the October 28, 2008 SIG Susquehanna report, the analyst wrote, "We believe investors were surprised by noted geographic effects, . . . and safety seemed to worsen with increases observed in investigator-reported hypertension." Eagan Decl., Ex. K at 1. He also wrote that hypertension was not a new concern as it was seen in the ITP and lymphoma studies, but noted that the magnitude of the increase and the fact that the increase was dose dependent was new information. *Id.* He wrote that the increase "should be closely monitored and increases program risk." *Id.*

Defendants also failed to disclose other important adverse safety data. ¶¶68-74. On December 13, 2007, they reported that there was a dose-dependent increase in alanine aminotransferase ("ALT") or liver enzymes in three patients in the 150mg cohort and none in the 50mg or 100mg cohort. ¶69. During the October 27, 2008 presentation, however, they reported that nine patients experienced a dose-dependent increase in ALT – two patients in the 50mg cohort, three patients in the 100mg cohort and four patients in the 150mg cohort. *Id.* Like hypertension data, analysts noted the new ALT data was surprising because it was not disclosed previously, and important because it confirmed R788's association with LFT increases. ¶¶69-70.

The six additional cases were patients that experienced ALT levels that were 1.2 times the upper limit of normal ("1.2x ULN") whereas the three cases reported previously experienced ALT levels that were three times the upper limit of normal. Defendants contend reports issued by analysts show the market did not consider the additional cases to be anything new. MTD at 18. But in the Oppenheimer report, which defendants cite in support of their contention, the analyst wrote that the

1   December 2007 data "*suggested* a possible association with LFT elevations" and that the October

2   2008 data "*showed* mild dose-dependent ALT elevations greater than 1.2x ULN *at all doses, which*

3   *confirms R788's association with LFT increases*." ¶70; Eagan Decl., Ex. J at 3.

4       On December 13, 2007, defendants reported that 15 patients experienced a dose-dependent

5   increase in neutropenia – 5 patients in the 100mg cohort and 10 patients in the 150mg cohort. ¶71.

6   During the October 27, 2008 presentation, however, they reported that 20 patients experienced

7   neutropenia – 1 in the 50mg cohort, 5in the 100mg cohort and 14 in the 150mg cohort. *Id*. Analysts

8   again noted that the "data showed an increase in neutropenia from previously reported top line data"

9   and that "[t]here were five additional cases of neutropenia in the full phase IIa data." ¶72.

10      Defendants again contend reports issued by analysts show there was "nothing new" about the

11  five additional cases. MTD at 17. But the Oppenheimer analyst reported that the full phase IIa data

12  showed *an increase in neutropenia from previously reported top-line data* and that *R788's side*

13  *effect profile is not benign, as suggested by prior data*. ¶¶69, 72; Eagan Decl., Ex. J at 1.[6]

14      On December 13, 2007, defendants reported 15 patients experienced diarrhea (3 in the 50mg

15  group, 2 in the 100mg group and 10 in the 150mg group) and 15 patients experienced GI side effects

16  (1 in the 50mg group, 2 in the 100mg group and 12 in the 150mg group). ¶¶73-74. On October 27,

17  2008, defendants revealed that 34 patients had reported diarrhea (5 in the 50mg group, 8 in the

18  100mg group and 21 in the 150mg group) and 35 had reported GI side effects (4 in the 50mg group,

19  14 in the 100mg group and 17 in the 150mg group). Defendants contend the additional cases were

20  not material because no analyst mentioned them after they were disclosed in October 2008. MTD at

21  19. This is untrue. The additional cases were reported by two analysts. Eagan Decl., Ex. L at 3, Ex.

22

23  [6]   Defendants contend the November 4, 2008 Jeffries report shows there was "nothing new"
    about the additional neutropenia cases because the analyst wrote that "there appears to be no
24  change." MTD at 17 (citing Eagan Decl., Ex. P at 5). However, the analyst apparently made a
    simple mistake because elsewhere in his report he notes the higher neutropenia adverse events
25  disclosed on October 27, 2008. *See* Eagan Decl., Ex. P at 7 (ACR 2008 Laboratory Adverse Events
    Table). The remainder of the analyst reports cited by defendants for this proposition are even less
26  supportive as those reports note only that it was not "news" that R788 had a particular toxicity. *See*
    MTD at 17 n.9 and 18 n.11. This is not the same as saying that the higher number of adverse events
27  for each toxicity was not new data.

28

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OF RIGEL AND INDIVIDUAL
DEFENDANTS - 3:09-cv-00546-JSW                                           - 15 -

1   P at 7.  Further, the fact that some analysts focused more on the differing response rates and other

2   adverse safety information does not mean the concealed information about GI side effects was

3   immaterial, only that those analysts viewed it as less important than the other concealed information.

4          In short, analysts reported the previously concealed adverse safety information was new and

5   significant, and that the substantial decline in Rigel's stock price indicated the market was "troubled"

6   by the new negative information.[7]  Eagan Decl., Ex. H at 1 (noting market "over-reaction" to new

7   efficacy and toxicity data); Eagan Decl., Ex. J at 1-2 ("Shares fell sharply, likely due to . . . concerns

8   about safety" and noting new data gave "more complete toxicity picture."); Eagan Decl., Ex. K at 1

9   (noting "sell-off" after "RIGL presented updated data" from Phase IIa trial); Eagan Decl., Ex. L at 1

10  (downgrading stock due to "heightened safety concerns").

11              **3.      The Concealed Adverse Safety Information Was Material**

12         The reports issued by the analysts confirm that the previously undisclosed adverse safety data

13  was material, and courts have ruled that it is materially misleading to make statements about the

14  safety of a drug candidate without disclosing additional facts that raised serious questions about

15  safety.  ¶¶63-67; *see In re Connectics Corp. Sec. Litig.*, No. C07-02940 SI, 2008 U.S. Dist. LEXIS

16  62515, at *22 (N.D. Cal. Aug. 14, 2008); *In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20, 28 (D.

17  Mass. 2004) (statements regarding a drug candidate's safety issue was material based on allegation

18  that FDA had "zero tolerance" policy on that safety issue).

19         The materiality of the concealed adverse safety information is also established by the 200%

20  increase in the Company's stock price following the December 13, 2007 false and misleading

21  disclosures, and the 38% decline in the Company's stock price following the disclosure of the

22  previously concealed adverse safety data on October 27, 2008.  ¶¶52, 127; *Am. West*, 320 F.3d at

23  935 (Stock price reaction "further supports a finding of materiality.").

24

25

_____

26  [7]     Additionally, the snippets of analyst reports cited by defendants do not reflect an "untroubled
27  market" but rather the individual opinion of the specific analyst as to the possible future impact of
    the additional data.  *See* MTD at 17 n.10 and 18 n.12.

28

1    Defendants assert that plaintiff does not allege facts that show the differences in the safety

2    numbers were material because the omission of incidents of patients with mild symptoms is not a

3    concealment of risks that would affect the market's perception of R788's potential value.  MTD at

4    15-16.  Plaintiff does not allege materiality based only on the difference in safety numbers.  Plaintiff

5    alleges the magnitude of the increase in blood pressure (as high as 30mmHg) and the fact that the

6    increase in blood pressure was dose dependent was material information that was concealed.  That

7    information and the differences in the safety numbers were material.  Indeed, analysts reported the

8    previously concealed safety information raised questions about R788.  ¶¶64-67.  Further, the

9    significant changes in Rigel's stock price after the December 13, 2007 and October 27, 2008

10   disclosures also establish the concealed safety information was material.  ¶¶52, 127.

11   The cases cited by defendants for their erroneous contention that plaintiff does not allege

12   facts that show the differences in the safety numbers were material are unavailing.  For example, in

13   *In re Intrabiotics Pharms., Inc. Sec. Litig.*, No. C 04 02675 JSW, 2006 WL 2192109, at *11-*12

14   (N.D. Cal. Aug. 1, 2006), this Court ruled that materiality was not adequately alleged because

15   interim results from a clinical study did not establish the drug caused the adverse events.  Here, by

16   contrast, it is not disputed that R788 caused an increase in blood pressure and that the increase was

17   dose dependent.  Nor is it disputed that R788 caused the other adverse side effects at issue.

18   In *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 154 (2d Cir. 1998), Carter-Wallace

19   represented in June 2004 that sales of a drug (Felbatol) were greater than planned and that the rate of

20   growth was expected to continue.  Plaintiffs alleged the statements were materially false and

21   misleading because Carter-Wallace knew that six patients had died as a result of taking the drug.  *Id*.

22   After learning on August 1, 2004 that four more patients had died, Carter-Wallace and the FDA

23   issued a "Dear Doctors" letter recommending that most patients be withdrawn from the drug.  *Id*.

24   The court ruled that Carter-Wallace did not have a duty to disclose the drug-related deaths before

25   August 1, 2004 because the company did not yet have information showing the drug had caused a

26   statistically significant number of deaths and, therefore, had reason to believe that the commercial

27   viability of the drug was threatened.  *Id*. at 157.

28

1   Here, plaintiff alleges defendants made false and misleading statements about the efficacy

2   and safety of R788, not about the sales of R788.   Moreover, the Second Circuit recently

3   acknowledged that this test does not apply to "a development stage company that failed to disclose

4   negative studies that threatened not only the product's commercial viability, but also the company's

5   viability." *Masters v. GlaxoSmithKline*, 271 Fed. Appx. 46, 51 (2d Cir. 2008).   Indeed, in that case,

6   the Second Circuit noted that the drug in Carter-Wallace affected less than 1% of the company's

7   products.   *Id*.   Here, R788 was Rigel's lead product candidate, and defendants knew the Company

8   would become insolvent if it was not able to raise additional funds, which in turn was dependent on

9   investors' perceptions of the commercial viability of R788.   ¶¶81, 88-92.   Indeed, defendants

10  concealed the adverse safety information and differing response rates so Rigel could raise additional

11  funds by issuing five million shares at an inflated price of $27.00 per share. ¶¶90-91.

12  Finally, defendants contend that if they were required to disclose the concealed adverse

13  safety information, there would have been "an excess of disclosure" that would have caused

14  shareholders to miss relevant information.   MTD at 16 (citing *Twinde v. Threshold Pharms., Inc.*,

15  No. C 07 4972 CW, 2008 WL 2740457, at *9 (N.D. Cal. July 11, 2008)).   That contention fails to

16  explain why the adverse safety information was disclosed on October 27, 2008.

17  In short, plaintiff alleges more than sufficient facts to show the concealed adverse safety

18  information was material.   Further, as noted above, materiality is a fact question that should not be

19  resolved on a motion to dismiss.   *TSC*, 426 U.S. at 450; *Fecht*, 70 F.3d at 1081.

20  ### 4.   Defendants' Other Factual Assertions Are Unsupported by the Authority upon Which They Rely

21  Defendants rely on *Padnes v. Scios Nova, Inc.*, No. C 95 1693 MHP, 1996 WL 539711, at *5

22  (N.D. Cal. Sept. 18, 1996), for their contention that they were not required to disclose the differing

23  response rates by U.S. and Mexican patients or the adverse safety information because their

24  statements were not misleading.   MTD at 12-13.   In *Padnes*, the court noted that "[p]laintiffs do not

25  dispute that Scios Nova's summaries of the Colorado study were factually accurate in the sense that

26  they faithfully reported the study's conclusions[,]" but did contend that the summaries were

27  misleading because defendants failed to disclose "design defects" in the study.   1996 WL 539711, at

28

1    *5.  The court ruled that "where a company accurately reports the results of a scientific study, it is

2    under no obligation to second-guess the methodology of that study."  *Id*.  Here, unlike *Padnes*,

3    plaintiff does claim defendants' statements about the R788 phase IIa clinical study were false and

4    misleading, and does not take issue with the design or methodology of the study.

5         In *Padnes*, the court also noted that the failure to disclose details of the study's design did not

6    amount to facts explaining why the difference between the earlier and later statements was not

7    merely the difference between two permissible judgments but rather the result of falsehood.  *Id*.

8    Here, as explained above, the difference between the earlier and later statements about efficacy and

9    safety was the result of falsehood because the earlier statements "affirmatively create[d] an

10   impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]."

11   *Brody*, 280 F.3d at 1006.

12        Without citing any authority, defendants contend that their "initial disclosures were true and

13   were not contradicted or undermined by the later, more granular disclosures" because "it was clear

14   that Rigel did not represent it was disclosing all adverse events or side effects but just the "key safety

15   results."  MTD at 15.  But defendants did not disclose "key safety results," including that blood

16   pressure increased by as much as 30mmHg and that the increase was dose dependent.  That is why

17   defendants' statements "affirmatively create[d] an impression of a state of affairs that differ[ed] in a

18   material way from the one that actually exist[ed]."  *Brody*, 280 F.3d at 1006.  Further, neither the

19   December 13, 2007 press release nor the conference call transcript references additional cases to be

20   reported later.  Defendants present no support for their distinction nor any basis why a reasonable

21   investor would know of the distinction.

22        Notably, the Ninth Circuit recently rejected a similar, albeit stronger contention in *Berson*.

23   There, defendants asserted, and the district court ruled, reasonable investors would have known how

24   defendants accounted for their "backlog" based on certain language in a Securities and Exchange

25   Commission filing and a conference call discussion.  *Berson*, 527 F.3d at 986.  In words applicable

26   here, the Ninth Circuit rejected that contention and reversed:

27              With the benefit of hindsight and some help from the briefs, we can see how
             this exchange might be interpreted to communicate that defendants counted stopped
28           work as backlog. . . .  But it's far from clear that a reasonable investor could have

decoded this meaning at the time. . . .  Absent undisputed evidence that these were terms of art that investors would have understood to refer to stop-work orders, we cannot find, as a matter of law, that defendants disclosed that backlog included a significant amount of work that had been halted by the company's customers.

*Id.* at 986-87; *see also In re CV Therapeutics, Inc., Sec. Litig.*, No. C03 3709 SI, 2004 U.S. Dist. LEXIS 98244, at *22 (N.D. Cal. Apr. 4, 2007).

### 5. Plaintiff's Allegations When Viewed as a Whole Demonstrate Material Falsity

The Court should decline defendants' invitation to analyze the falsity of the efficacy statements and the safety statements separately but should evaluate the statements at issue in context and as a whole.  *In re Apollo Group Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 920 (D. Az. 2005) (Defendants' statements as a whole were misleading.); *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2nd Cir. 1990) ("The central issue on all three claims is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the debentures.").  As Justice Rehnquist explained, "[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it." *Bourjaily v. United States*, 483 U.S. 171, 179-80 (1987).  This approach makes particular sense where the subject matter of the statements is the same, the Phase IIa study results and defendants' statements had a synergistically misleading effect.

### B. Plaintiff Has Alleged Facts Raising a Strong Inference of Scienter

As explained above, defendants do not dispute that they knew the country interaction and the adverse safety information that was not disclosed until October 27, 2008.  No more is required to establish a strong inference of scienter.  *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement.").

Motive allegations strengthen the inference of scienter.  Defendants knew that Rigel needed to raise funds to avoid insolvency.  ¶¶88-92; *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 & n.8 (9th Cir. 2000) ("[M]otive to inflate sales to raise financing" is circumstantial evidence of scienter);

1    *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (Scienter can be based on personal

2    financial incentives where the corporate officers understood the subject of the fraud "was important

3    to their own survival and that of the company."). Defendants knew that Rigel reported just $44.5

4    million of cash and $82.2 million of capital as of December 31, 2007, and would become insolvent if

5    it did not raise funds. ¶89. Indeed, absent the $127.5 million raised in the Offering, Rigel would

6    have become insolvent by the end of 3Q08 because it reported a $99 million net loss in the first nine

7    months of 2008. *Id.*

8         In addition, defendants knew the disclosure of the differing response rates and adverse safety

9    data would make it more difficult, if not impossible, to raise additional funds because it would cause

10   the Company's stock price to decline. ¶90. In fact, from November 8, 2007 to December 4, 2007,

11   Rigel's stock price declined 40%, which analysts attributed to concerns about adverse safety data

12   related to another clinical trial that the Company disclosed on November 9, 2007. ¶¶91-92. Thus,

13   defendants knew that the Company's stock price would decline again if the differing response rates

14   and adverse safety data were disclosed on December 13, 2007, so they concealed the adverse

15   information. *Id.* Absent the concealment, the Company's stock price would not have tripled, and

16   Rigel would not have been able to sell five million shares at $27.00 per share.

17        Defendants contend incorrectly that courts reject scienter claims based on a company's desire

18   to raise capital. MTD at 23 (citing *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir.

19   2002)). In *Lipton*, plaintiffs alleged that "PathoGenesis concealed knowledge of flat patient demand

20   to enhance opportunity (1) to secure a line of credit from its lender and (2) to gain regulatory

21   approval abroad." 284 F.3d at 1038. The Ninth Circuit stated that "[t]hese generalized assertions of

22   motive, without more, [were] inadequate to meet the heightened pleading requirements of *Silicon*

23   *Graphics*." *Id.* Particularized allegations, however, are sufficient. In *Howard*, the Ninth Circuit

24   ruled that defendant had a motive to inflate sales to raise financing because loan covenants required

25   the company to maintain a $90 million net worth, and the company's net worth was projected to

26   decline to $90 million in one quarter. 228 F.3d at 1064. Other courts have also found such

27   particularized allegations sufficient. *See, e.g.*, *In re U.S. Aggregates, Inc., Sec. Litig.*, No. C01 1688

28   CW, 2003 U.S. Dist. LEXIS 12168, at *14 (N.D. Cal. Jan. 24, 2003) ("[S]ignificant cash flow

1   problems that U.S. Aggregates dealt with by borrowing money" and requirement "to be in

2   compliance with the Loan Agreements in order to be able to borrow more money . . . considered in

3   combination, offer an additional, powerful motive for Defendants to inflate U.S. Aggregates'

4   revenues: to allow [it] to continue to borrow the money that it needed to operate.").

5        Gower, Grossbard, Payan, Rodriguez and Maynard also knew that they would receive higher

6   salaries, bonuses and stock option awards, and that the value of their existing stock options would

7   increase substantially if Rigel reported positive results from the Phase IIa clinical trial. ¶¶103-108.

8   A strong correlation between financial results and stock options or cash bonuses supports an

9   inference of scienter if the allegations show how intimately compensation was tied to the company's

10  financials. *Zucco Partners, LLC v. Digimarc Corp.*, No. 06 35758, 2009 U.S. App. LEXIS 583, at

11  *56 (9th Cir. Jan. 12, 2009) (citing *Am. West*, 320 F.3d at 944); *In re Cornerstone Propane Partners,*

12  *L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1092 (N.D. Cal. 2005) ("[A]llegations about individual

13  defendants' incentives squarely contribute to a strong inference of scienter . . . ."). The Company's

14  proxy statements establish that the compensation of Gower, Grossbard, Payan, Rodriguez and

15  Maynard was based on the clinical development of Rigel's new product candidates, and that each

16  received substantial salary increases, bonuses and stock options at the end of 2007 because of the

17  reported results of the Phase IIa clinical trial and the increase in the price of the Company's stock at

18  the end of 2007. ¶¶103-106; *Digimarc*, 2009 U.S. App. LEXIS 583, at *57. The proxy statements

19  also establish the value of their stock options increased substantially due to the tripling of Rigel's

20  stock price caused by defendants' misleading statements about the Phase IIa clinical study. ¶107.

21       Defendants' contention that courts reject efforts to plead scienter based on allegations

22  concerning executive compensation ignores the Ninth Circuit's opinions in *Digimarc* and *Am. West*.

23  MTD at 23. The cases they rely upon simply stand for the proposition that "routine business

24  objectives, without more, cannot normally be alleged to be motivations for fraud." *Constr. Laborers*

25  *Pension Trust of Greater St. Louis v. Neurocrine Biosciences, Inc.*, No. 07CV1111-IEG RBB, 2008

26  WL 2053733, at *7 (S.D. Cal. May 13, 2008) (citing *Lipton*, 284 F.3d at 1038).

27       Defendants contend their failure to sell Rigel stock negates scienter. MTD at 21-22.

28  However, the Ninth Circuit has expressly held "the lack of stock sales by a defendant is not

1   dispositive as to scienter" and that "[s]cienter can be established even if the officers who made the

2   misleading statements did not sell stock during the class period." *Am. West*, 320 F.3d at 944. So

3   have this Court and other courts. *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1107 (N.D. Cal.

4   2006) ("[F]ailure to allege selling or trading did not negate the inference of scienter."); *U.S.*

5   *Aggregates*, 2003 U.S. Dist. LEXIS 12168, at *13; *In re Nuko Info. Sys., Inc., Sec. Litig.*, 199 F.R.D.

6   338, 344 (N.D. Cal. 2000). The cases cited by defendants provide no support for their position

7   because plaintiffs in those cases alleged that insider sales demonstrated scienter. MTD at 21-22.

8       **C.    The Underwriter Defendants Are Liable for the Material**
        **Misstatements and Omissions in the Registration Statement**

9

10          Plaintiff has alleged viable causes of action under §§11 and 12(a)(2) of the 1933 Act against

11   the underwriter defendants. ¶¶37-42, 109-119, 159-171.[8] As discussed extensively above, the

12   Registration Statement for Rigel's Offering contained materially false and misleading statements

13   regarding the Phase IIa results. Public investors relied on the underwriter defendants to conduct a

14   reasonable investigation and "to obtain and verify relevant information and then make sure that

15   essential facts are disclosed." *In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 684 & n.53

16   (S.D.N.Y. 2004). Because a reasonable search would have discovered the false and misleading

17   statements, the underwriter defendants are liable for the harm caused to investors. *Herman &*

18   *Maclean v. Huddleston*, 459 U.S. 375, 382 (1983); *see also* 15 U.S.C.A. §77k(b)(3) and 15 U.S.C.A.

19   §77l(a)(2). Indeed, according to the January 31, 2008 underwriting agreement, Rigel provided the

20   underwriter defendants with a "General Disclosure Package" that included, among other things, a

21   listing of the Company's clinical trials and "descriptions of the results of the studies, tests and trials."

22   ¶117. Thus, the underwriter defendants either knew about the differing response rates and adverse

23   _____

      [8]    Defendants claim that because plaintiff's claims under §§11 and 12(a)(2) "sound in fraud,"
24   they must be alleged with particularity under Fed. R. Civ. P. 9(b). MTD at 12. This is incorrect
     because plaintiff bases these claims on strict liability and negligence, including, but not limited to,
25   each defendant's failure to make a reasonable investigation. ¶¶162-163, 169; *Vess v. Ciba-Geigy
     Corp., USA*, 317 F.3d 1097, 1105-06 (9th Cir. 2003). Indeed, plaintiff does not allege any claims
26   based on fraud against the director defendants and the underwriter defendants. *In re Fuwei Films
     Sec. Litig.*, No. 07 CW 9416 (RJS), 2009 U.S. Dist. LEXIS 59658, at *36-*37 (S.D.N.Y. July 10,
27   2009). In any event, this heightened pleading standard applies only to falsity and has been met. *See
     In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 & n.3 (9th Cir. 1996).

28

1   safety data and failed to require its disclosure, or did not know by failing to conduct a reasonable

2   investigation and independently verifying the representations in the Registration Statement.  ¶118.

3   Either way, the underwriter defendants failed to meet their "gatekeeper" duty to investors.  *Id.*;

4   *Worldcom*, 346 F. Supp. 2d at 684 & n.53.

5     The underwriter defendants do not dispute their obligations to investors related to the

6   Offering or their knowledge of the efficacy and safety information not disclosed in the Registration

7   Statement.  Indeed, they did not even file a motion to dismiss.  Rather, they simply filed a Joinder

8   and relied on the Rigel defendants' motion.  Dkt. No. 35.

9     **D.** **Defendants' Statements Regarding Partnership Discussions Being on Track Are Statements of Current Business Conditions**

10    Contrary to defendants' cursory arguments, statements regarding partnership discussions

11  being "on track" are statements of current business conditions not subject to PSLRA's safe harbor.

12  In *In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp. 2d 980 (N.D. Cal. 2001), Judge Wilken

13  addressed this very argument and rejected it, holding that statements that company "was on track to

14  meet expectations" are "statements of current business conditions" and "do not fall under the

15  PSLRA's safe harbor provision."  *Id.* at 990; *see also CV Therapeutics*, 2004 U.S. Dist. LEXIS

16  17419, at *33 ("The fact that defendants used those inadequately disclosed historical facts to support

17  unsound projections does not shield their alleged misrepresentations as forward-looking

18  statements.").  Moreover, defendants knew that their statements were false and misleading because

19  they knew the true Phase IIa results were not sufficient to attract a partnership.  ¶¶137-138.

20    **E.** **Plaintiff Acquired Stock Through the Offering**

21    Plaintiff purchased 3,590 shares of Rigel's stock on January 31, 2008 for $27.00 per share

22  and therefore has standing to assert §§11 and 12(a)(2) claims.  ¶¶22, 109-114.  Defendants contend

23  the certification attached to the Complaint shows that plaintiff did not purchase shares pursuant to or

24  traceable to the Offering because plaintiff alleges the Rigel stock issued pursuant to the Offering was

25  not sold until February 6, 2008.  MTD at 23-24.  That contention is baseless because it ignores the

26  fact that on January 31, 2008, Rigel announced the pricing of the Offering ($27.00 per share) and

27  that it was expected to close on February 6, 2008.  Exhibit 1 to the Declaration of Christopher P.

28

1   Seefer in Support of Plaintiff's Opposition to Motion to Dismiss ("Seefer Decl."), filed concurrently

2   herewith.  The January 31, 2008 prospectus supplement also stated that delivery of the shares would

3   be made on or about February 6, 2008.  Seefer Decl., Ex. 2.  Plaintiff's brokerage statement confirms

4   the shares were purchased on January 31, 2008 and that the transaction settled on February 6, 2008.

5   Seefer Decl., Ex. 3.

6           **F.      Plaintiff Has Alleged a Primary Violation and Therefore May Assert
                      Control Person Claims Under Sections 20(a) and 15**
7
8           For the reasons noted above, plaintiff has properly alleged violations of §§10(b), 11 and

9   12(a)(2).  Moreover, plaintiff has adequately alleged each defendant's ability to exercise control over

10  the activity on which the primary violation is alleged.  ¶¶24-28, 157-158, 172-175; *In re Charles*

11  *Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 550-51, 555-56 (N.D. Cal. 2009) (officers and signers of

12  registration statements in position to exercise power and control).

13  **V.      CONCLUSION**

14          For the reasons set forth above, plaintiff respectfully requests that defendants' motion be

15  denied in its entirety.  If any part of defendants' motion is granted, plaintiff respectfully requests

16  leave to amend.  *See Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003)

17  (Leave to amend should be granted liberally.).

18  DATED:  October 23, 2009                  Respectfully submitted,

19                                             COUGHLIN STOIA GELLER
                                                 RUDMAN & ROBBINS LLP
20                                             CHRISTOPHER P. SEEFER
                                               D. CAMERON BAKER
21                                             DANIEL J. PFEFFERBAUM
                                               S. ASHAR AHMED
22

23                                                          /s/
                                               _____
24                                             CHRISTOPHER P. SEEFER

25                                             100 Pine Street, Suite 2600
                                               San Francisco, CA  94111
26                                             Telephone:  415/288-4545
                                               415/288-4534 (fax)
27
                                               Lead Counsel for Plaintiff
28  S:\CasesSD\Rigel Pharmaceuticals\bRF00062186.doc

CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I further certify that I caused this document to be forwarded to the following Designated Internet Site at:  http://securities.stanford.edu.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 23, 2009.

_____
/s/
CHRISTOPHER P. SEEFER

COUGHLIN STOIA GELLER
       RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

E-mail:chriss@csgrr.com

## Mailing Information for a Case 3:09-cv-00546-JSW

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Margaret Irene Branick-Abilla**
  mbranickabilla@cooley.com,wilsonla@cooley.com,foxl@cooley.com

- **John C. Dwyer**
  dwyerjc@cooley.com,giovannonib@cooley.com

- **Shannon Marie Eagan , Esq**
  seagan@cooley.com

- **William S. Freeman**
  freemanws@cooley.com,galancr@cooley.com,dvance@rigel.com

- **Jerry L. Marks**
  jmarks@milbank.com,mawalsh@milbank.com

- **Matthew Paul Montgomery**
  mattm@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Sundeep Ravindra Patel**
  spatel@cooley.com

- **Erik David Peterson**
  epeterson@btkmc.com

- **Daniel Jacob Pfefferbaum**
  DPfefferbaum@csgrr.com,aserros@csgrr.com,nrogers@csgrr.com,khuang@csgrr.com

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

- **Christopher Paul Seefer**
  chriss@csgrr.com,jdecena@csgrr.com,vcordial@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,mburch@csgrr.com,cbaker@csgrr.com,e_file_sd@csgrr.com

- **Paul Michael Torres**
  ptorres@milbank.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)